En el Tribunal Supremo de Puerto Rico

| Municipio de San Juan<br>      Peticionario<br><br>      V.<br><br>Junta de Calidad Ambiental,<br>Administración de Reglamentos y<br>Permisos/Corp. De Desarrollo Hotelero/<br>Development Management Group, Inc.<br>      Recurridos | Certiorari<br><br>99 TSPR 147 |

Número del Caso: CC-1999-0496

Abogados del Municipio de San Juan: Lcdo. Alberto O. Jiménez Santiago
                                    Lcdo. Luis Sánchez Caso

Abogada de la Junta de Calidad Ambiental: Lcda. Jenniffer Mayo

Abogados de Corp. Desarrollo Hotelero: Lcdo. Luis E. González Ortiz
                                       Lcdo. Pedro A. Delgado Hernández

Abogada de A.R.P.E.: Lcda. Ana I. Vázquez Sánchez

Abogado de DMG: Lcdo. Néstor Durán

Tribunal de Circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Alfonso de Cumpiano

Fecha: 10/5/1999

Materia: Acción Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de San Juan

    Peticionario

      v.

                             CC-1999-496

Junta de Calidad Ambiental
Administración de Reglamentos y
Permisos/Corp. de Desarrollo
Hotelero Development Management
Group, Inc.

    Recurridos

Opinión del Tribunal emitida por la Juez Asociada señora Naveira de Rodón.

San Juan, Puerto Rico a 5 de octubre de 1999

En el día de hoy acometemos la tarea de aclarar de una vez los contornos de una resolución emitida por la Junta de Calidad Ambiental (en adelante la Junta) en un procedimiento de declaración de impacto ambiental.

A continuación hacemos un recuento del trasfondo fáctico y procesal que ha dado lugar al asunto que hoy nos ocupa.

I

La Corporación de Desarrollo Hotelero de Puerto Rico (en adelante CDH) es dueña del

Complejo Condado Beach Trío localizado en la Avenida Ashford del Sector Condado del Municipio de San Juan.[1] Este complejo está compuesto por el Hotel La Concha, el Centro de Convenciones y el Hotel Condado Vanderbilt (conocido como Hotel Condado Beach). Conforme a los documentos que obran en autos, la operación de este complejo resultaba en una pérdida de aproximadamente siete ($7) millones de dólares anuales. Debido a ello, se optó por cesar sus operaciones en julio de 1997. Posteriormente, se creó un Comité de Privatización (en adelante Comité) con el propósito de solicitar y evaluar propuestas particulares para la adquisición, restauración y desarrollo del Condado Beach Trío.[2]

Luego de recibir varias alternativas, entre las cuales se encontraba la propuesta por el Municipio de San Juan (en adelante Municipio), el Comité le recomendó a CDH la sometida por Development Management Group, Inc. (en adelante DMG). Tal propuesta consiste en la compraventa del Condado Beach Trío por la suma aproximada de veinte ($20) millones de dólares. Además, conlleva el desarrollo de un proyecto conocido como el "Condado Beach Resort" el cual consta de dos (2) fases. Primero, la demolición del Hotel La Concha, el Centro de Convenciones y el anexo del antiguo Hotel Condado Vanderbilt. La estructura del edificio Hotel Condado Vanderbilt sería restaurada. Segundo, la construcción de un complejo hotelero, residencial y comercial en un terreno de aproximadamente 9.66 cuerdas. En específico, se propone construir un edificio multiuso que comprende ciento veinticinco (125) unidades de apartamientos tipo compartido, o comúnmente conocidos como "time share", un hotel de cuatrocientas (400) habitaciones, un hotel de tiempo compartido de setenta y una (71) unidades en el Hotel Condado Vanderbilt, un edificio de apartamientos

---

[1] Conforme surge de la "Moción en Cumplimiento de Orden y en Oposición a Petición de certiorari", CDH es una corporación cuyas acciones pertenecen a la Compañía de Turismo de Puerto Rico.

[2] El Comité estaba compuesto por representantes de CDH, el Banco Gubernamental de Fomento Económico para Puerto Rico y consultores externos.

con setenta y dos (72) unidades y un centro comercial para el alquiler de locales, así como áreas de entretenimiento y servicios. También se construirán dos (2) estacionamientos; uno tipo edificio multiuso y otro soterrado.[3]

El 22 de mayo de 1998, DMG presentó a la Administración de Reglamentos y Permisos (en adelante ARPE) una Consulta sobre Conformidad con el Reglamento de Zonificación, para el Proyecto Condado Beach Resort. Como parte de dicho procedimiento, ARPE requirió una evaluación de impacto ambiental que DMG preparó.

Así pues, el 31 de julio de 1998 y en relación con el Proyecto Condado Beach Resort, ARPE presentó ante la Junta una Declaración de Impacto Ambiental Preliminar (en adelante DIA-P) en la cual se describió el proyecto propuesto. La DIA-P fue circulada entre las agencias concernidas y estuvo disponible para la inspección del público. La Junta nombró un oficial examinador para investigar y someter recomendaciones. Se celebraron las correspondientes vistas a las que comparecieron el Municipio, ciudadanos por sí y en representación de organizaciones cívicas, culturales, religiosas y gubernamentales.

El 7 de diciembre de 1998, el oficial examinador sometió su Informe. En éste especificó que los comentarios a ser atendidos eran los dirigidos estrictamente a la cuestión ambiental. Además: (i) resumió las ponencias más relevantes del Municipio, de otros deponentes y de la Junta; (ii) incluyó un segmento de la extensa presentación del proyecto hecha por la parte proponente recurrida y (iii) discutió el derecho aplicable a las declaraciones de impacto ambiental, en cuanto a los requisitos y la función de la Junta. En relación con las conclusiones, el oficial examinador señaló que el proyecto no variaba sustancialmente los usos existentes. Aclaró que su rol no era evaluar

---

[3] Surge del escrito titulado "Moción en Cumplimiento de Orden" presentado por DMG que en agosto de 1998 esta última suscribió junto a CDH el correspondiente contrato de compraventa. Véase, además, nota al calce Núm. 1 en dicho escrito.

otros proyectos de desarrollo turísticos sino velar porque el proyecto seleccionado cumplía con la ley y reglamentación ambiental. Aun cuando opinó que, en su etapa preliminar el documento cumplía con el propósito principal de servir como instrumento de planificación, concluyó que la DIA-P requería mayor información sobre ciertos aspectos de significativa importancia que debían ser suplidos en una Declaración de Impacto Ambiental-Final(en adelante DIA-F).

Entre las recomendaciones del Informe del oficial examinador estaban las siguientes:

1. El documento final deberá contener las contestaciones a los comentarios o preocupaciones de la ciudadanía respecto a la adecuacidad de la DIA-P.

2. Incluir en el documento carta del Municipio de San Juan mediante la cual este último acepta la disposición final de los desperdicios sólidos no peligrosos. En su defecto, se analicen otras alternativas tales como el reciclaje.

3. Sustituir copia de mapa de suelos por una legible.

4. Proveer un análisis que permita determinar cuáles son los efectos que el proyecto causaría en la zona marítimo terrestre.

5. Profundizar la discusión en torno a las alternativas propuestas (la opción de no construir, la opción del proyecto y la opción de restaurar el complejo). Además, de incluir más alternativas.

6. Discutir ampliamente el impacto en el ambiente de las emisiones de polvo fugitivo y ruido al momento de construirse el proyecto propuesto.

7. Incluir en el documento las recomendaciones y observaciones no sólo de las agencias consultadas sino también de la ciudadanía durante el proceso de consulta.

8. En atención de los graves problemas del área sobre la congestión de vehículos, discutir el impacto en el tránsito que tendrán las facilidades propuestas.

9. Discutir las precauciones a tomar para evitar que, en el proceso de demolición por implosión, se afecte el edificio Condado Vanderbilt (Hotel Condado Beach). Además, estudiar la estabilidad de los suelos.

10. Discutir de manera clara y específica en qué consisten las obras de restauración del Hotel Condado Vanderbilt, (Condado Beach Hotel).

11. Ampliar discusión sobre la sombra en la zona de la playa. En particular, la proyección de sombra de los edificios actuales en comparación a los propuestos.

La Junta, mediante Resolución de 8 de diciembre de 1998, aprobó íntegramente el Informe del oficial examinador y lo incorporó a su dictamen. La resolución fue notificada el 9 de diciembre de 1998. Por otra parte, el 3 de febrero de 1999 DMG y ARPE presentaron la DIA-F ante la Junta.

Así las cosas, el 19 de febrero de 1999 el oficial examinador rindió un Informe Suplementario. En éste concluyó que la DIA-F cumplía con los requisitos de adecuacidad del Art. 4 (c) de la Ley sobre Política Ambiental, Ley Núm. 9 de 18 de junio de 1970. El 2 de marzo de 1999, la Junta emitió una resolución carente de determinaciones de hecho y conclusiones de derecho. En la misma se limitó a señalar que aprobaba "en todas sus partes el Informe Suplementario del Oficial Examinador, el cual se hace formar parte de la presente Resolución." Señaló, además, que la DIA-F discutía adecuadamente los posibles efectos ambientales de la actividad propuesta. Finalmente, emitió varias recomendaciones relacionadas con la obtención de permisos previos a la construcción.[4]

En atención a lo anterior, el 23 de marzo de 1999 el Municipio, mediante moción, solicitó a la Junta reconsideración de su dictamen. Esta moción fue acompañada de un Informe Suplementario sobre DIA-F y un Informe Pericial Especial sobre Tránsito. Sin embargo, ese mismo día la Junta declaró sin lugar dicha reconsideración.

Mientras tanto, el 7 de abril de 1999, CDH solicitó ante ARPE tres permisos de demolición. Sin embargo, obtuvo sólo la aprobación de dos (2) de éstos.[5] Por su parte, el 23 de abril de 1999, el Municipio

---

[4] El 3 de marzo de 1999, el Municipio acudió a la Junta mediante Moción para Presentar Informe Suplementario y Oposición a Declaración de Impacto Ambiental Final. Con dicho escrito, el Municipio también incluyó un Informe Suplementario en el cual se analizó la DIA-F y se concluyó que ésta era insuficiente en las áreas de tránsito, vistas y acceso al mar, sombras proyectadas y actividad peatonal, discusión de métodos de demolición, impacto en el edificio Hotel Condado Vanderbilt (Hotel Condado Beach) y discusión de las alternativas. No obstante, aparentemente, la Junta nunca consideró dicho Informe.

[5] Conforme surge de la Moción en Cumplimiento de Orden presentada por ARPE, CDH presentó tres solicitudes de demolición:

solicitó intervención y reconsideración de la concesión del permiso de demolición ante ARPE.[6]

De otra parte, el 5 de mayo de 1999 el Municipio acudió al Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito) mediante un recurso de revisión en el cual solicitó la revocación de la resolución emitida por la Junta el 2 de marzo de 1999. Alegó que ésta había errado al determinar que la DIA-F presentada por ARPE para el Proyecto Condado Beach Resort cumplió con los requisitos de la Ley sobre Política Pública Ambiental. Adujo, además, que la Junta erró al emitir una resolución que no está sostenida en evidencia sustancial a base del récord. Finalmente, señaló que, no tan sólo la decisión era arbitraria y caprichosa sino también que carecía de determinaciones de hecho. Posterior a la presentación del recurso, el Municipio solicitó

---

1. La Solicitud Núm. 99-18-A-493: contempla la demolición mediante implosión. Tal solicitud fue objetada el 30 de abril de 1999. Sin embargo, según ARPE aún no se ha tomado determinación alguna. El Municipio de San Juan es parte interventora.

2. La Solicitud Núm. 99-18-A-494-CGDM: conlleva la demolición parcial y selectiva por método convencional para debilitar las estructuras previa a una implosión. Ésta incluye:

   a) Plaza alrededor del Centro de Convenciones y la porción este de la estructura que conecta al extremo este del antiguo Hotel Condado Vanderbilt.

   b) El sótano, primer, segundo y tercer piso alrededor de la torre de habitaciones del Hotel La Concha, y del anexo del Hotel Condado Vanderbilt.

   c) Excluye la demolición del Hotel Condado Vanderbilt.

   Esta solicitud de demolición parcial fue autorizada por ARPE sujeta a una serie de condiciones. En esta solicitud el Municipio también es parte interventora.

3. La Solicitud Núm. 99-18-A-515-CGDM: está dirigida a la demolición total del Hotel La Concha, Centro de Convenciones y el Anexo del Hotel Condado Vanderbilt. Esta solicitud fue aprobada sujeto a las mismas condiciones con las que se aprobó la demolición parcial.

[6] Conforme surge de la Moción en cumplimiento de orden presentada por CDH, el 20 de mayo de 1999, aparentemente pasados los quince (15) días sin que ARPE actuara sobre ésta, un oficial de la oficina regional de dicha agencia respondió mediante carta a la solicitud del Municipio y le concedió la intervención, sin actuar sobre la solicitud de reconsideración.

al Tribunal de Circuito la paralización de la demolición del Complejo Condado Beach Trío hasta tanto no se resolviera el asunto ante su consideración.

Luego de varios trámites procesales, el Tribunal de Circuito emitió una resolución en la cual denegó la paralización de la demolición. El Municipio entonces acudió ante nos mediante petición de certiorari acompañada de una moción en auxilio de jurisdicción.

El 25 de junio de 1999, este Tribunal emitió una sentencia mediante la cual expidió el auto de certiorari y ordenó la paralización de la demolición de los edificios del Complejo Condado Beach Trío hasta tanto el Tribunal de Circuito resolviera el asunto ante su consideración.

El 30 de junio de 1999, el Tribunal de Circuito emitió una resolución en la que confirmó la resolución de la Junta en cuanto a la DIA-F presentada por ARPE para el proyecto Condado Beach Resort y denegó el auto de revisión solicitado.

Por su inconformidad, el Municipio acudió ante nos mediante recurso de certiorari.[7]

---

[7] En auxilio de nuestra jurisdicción y a solicitud del Municipio, paralizamos la demolición del Condado Beach Trío "hasta que otra cosa disponga este Tribunal". En su petición el Municipio planteó los errores siguientes:

A. Erró el Honorable Tribunal Intermedio al utilizar un escrutinio judicial de deferencia cuando algunas de las controversias eran de derecho, por lo que a tono con la LPAU estos asuntos debían ser revisables en todos sus aspectos por el tribunal de competencia.

B. Erró el Honorable Tribunal Intermedio al denegar una petición de revisión judicial donde el peticionario cuestionaba la adecuacidad de una DIA-F aprobada por la JCA, aun cuando no cumplió con la Ley de Política Pública Ambiental y reglamentación complementaria que requería la identificación y discusión detallada y comparada de las alternativas al proyecto, según propuesto por el desarrollador DMG y acogido por la ARPE como agencia proponente.

C. Erró el Honorable Tribunal de Circuito de Apelaciones al confirmar la decisión administrativa, aun cuando la DIA-F presentada por la ARPE y aprobada por la JCA no cumplía con los requisitos de conservación y protección de la

Examinado el recurso presentado, concedimos un término para que las partes recurridas expusieran sus posiciones al respecto. Con el beneficio de sus comparecencias, procedemos a resolver sin ulteriores procedimientos.

El asunto a dilucidar se circunscribe a determinar si a la luz de las disposiciones legales aplicables, procede devolver el caso a la Junta para que emita una resolución en la cual fundamente la aprobación de la DIA-F con determinaciones de hecho y conclusiones de derecho suficientes para poner en posición al tribunal de poder ejercer su facultad revisora.

Antes de comenzar a examinar el asunto planteado, pasemos a discutir los preceptos generales que nos conducirán a comprender cuál es el fin primordial de una Declaración de Impacto Ambiental.

II

La Sec. 19 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico establece que "[s]erá política pública del Estado Libre Asociado de Puerto Rico la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad".... 1 L.P.R.A. Art. IV, Sec. 19. En virtud de tal mandato, la Legislatura aprobó la Ley sobre Política Ambiental, Ley Núm. 9 de 18 de junio de 1970, 12

---

legislación y reglamentación complementaria sobre edificios históricos.

D. Erró el Honorable Tribunal a quo al emitir una Resolución contraria al debido proceso de ley, modalidad procesal, y la LPAU, por no contener determinaciones de hecho y de derecho, en un caso donde había una parte que, por sus planteamientos y prueba presentada, convirtió el proceso en uno adversativo, lo que requería dirimir las controversias fácticas mediante un proceso adjudicativo.

E. E. Erró el Honorable Tribunal de Circuito de Apelaciones al confirmar una Resolución emitida por la JCA aprobando la DIA-F, aun cuando no había evidencia sustancial en el récord que sostuviera la decisión administrativa sobre la controversia del impacto ambiental del tránsito a generarse, como oposición del proyecto propuesto.

L.P.R.A. sec. 1121 y ss. En dicha ley se estableció como fin una política pública que fomentara la armonía entre las personas y su medio ambiente. Es decir, que promoviera la protección y promoción del ambiente y el bienestar de nuestra población, según enunciado en la Sec. 19, Art. VI de nuestra Constitución, supra. Véanse, 12 L.P.R.A. sec. 1122 y 1123.

Al redactarse la Ley sobre Política Pública Ambiental, supra se utilizó como modelo el esquema federal del "National Environmental Policy Act" (NEPA), 42 U.S.C.A. sec. 4332 y ss. En consecuencia, hemos resuelto que las interpretaciones judiciales de la ley federal resultan persuasivas y pueden ayudar en la interpretación de alguna sección de la ley local. A tales efectos en Misión Ind. P.R. v. J.C.A., res. el 29 de junio de 1998, 145 D.P.R.___ (1998) 98 JTS 77, pág. 1102, expresamos que, "[e]n vista de [que la Ley Núm. 9 se tomó en su mayor parte, casi literalmente, de la National Environmental Policy Act de 1969, 42 USCA 4321 et seq.] debemos referirnos a tal legislación federal, y a la jurisprudencia que ésta ha generado, como fuentes importantes para la interpretación de nuestra propia ley."

Sin embargo, también hemos aclarado que el uso de tales fuentes federales debía estar en "armonía con las exigencias de la política ambiental que fija nuestra Constitución, con el historial y sentido de nuestra propia Ley 9, y con las realidades particulares de Puerto Rico...." (Énfasis nuestro.)

A tono con la política para proteger nuestro ambiente y recursos naturales, la Ley sobre Política Pública Ambiental, supra, le impuso a los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado de Puerto Rico y sus sub-divisiones el deber de preparar una declaración de impacto ambiental antes de llevar a cabo cualquier acción o decisión gubernamental que afecte significativamente el ambiente. 12 L.P.R.A. sec. 1124(c). El propósito de dicha declaración es lograr que: (i) "se consideren a fondo las consecuencias ambientales significativas de la acción o

proyecto que se contempla" y (ii) "que se informe a las partes concernidas de las consecuencias ambientales aludidas para que todos puedan tomar la acción que estimen pertinente." [8] (citas omitidas). Fed. Pesc. Playa Picúa v. J.P., res. el 27 de mayo de 1999, 147 D.P.R.___ (1999); 99 J.T.S. 87, pág. 1079. Véanse, además: Sierra Club v. Morton, 510 F.2d 813 (5to Cir. 1975); Silva v. Lynn, 482 F.2d 1282 (1er. Cir. 1973); Weingberger v. Catholic Action of Hawaii, 454 U.S. 139, 102 S. Ct. 197, 70 L. Ed. 2d 298 (1981).

Para implantar la política pública de proteger el ambiente y nuestros recursos naturales, la Ley creó la Junta y le otorgó la facultad de evaluar aquellas acciones gubernamentales que afecten nuestro medio ambiente, al establecer un proceso de consultas o comentarios en el cual dicha agencia participa como custodio de la política pública ambiental. 12 L.P.R.A. secs. 1122 y 1124. Específicamente, le otorgó la responsabilidad de constatar que la agencia proponente cumpla fielmente con los requisitos procesales y sustantivos enunciados en el Art. 4(c) de la Ley sobre Política Pública Ambiental, supra, y sus reglamentos. 12 L.P.R.A. sec. 1124(c). Véase, además, García Oyola v. J.C.A., res. el 21 de febrero de 1997, 142 D.P.R. ___ (1997); 97 JTS 25, 663. Tal función la habrá de descargar mediante la evaluación de las DIA, los documentos que las acompañan, y

---

[8] Véase el Art. 5.4.1 del Reglamento sobre Declaraciones de Impacto Ambiental de 1ro. de junio de 1984 el cual dispone que:

> [e]l propósito primordial de la DIA es servir de **instrumento de planificación** para asegurar que en el proceso decisional gubernamental se incorpore la política pública ambiental enunciada en la ley. **Cuando sea posible** la DIA debe proveer suficiente información para agilizar los trámites de los diferentes permisos envueltos en la acción propuesta. Debe contener una amplia y objetiva discusión del impacto ambiental de la acción propuesta e informar al público y a los funcionarios gubernamentales sobre las alternativas razonables que evitarán o mitigarán los efectos adversos al medio ambiente. La DIA deberá ser concisa y clara, y deberá ser usada por las agencias y sus funcionarios conjuntamente con cualquier otra información relevante en la toma de decisiones para determinar la viabilidad de la acción propuesta.

los comentarios y documentos de terceras personas sometidos durante el proceso de consulta.

En resumen, la Junta es el organismo llamado a

> **ser custodio del medio ambiente para beneficio de las futuras generaciones; asegurar paisajes seguros, saludables, productivos, estéticos y culturalmente placenteros; preservar los importantes aspectos históricos, culturales y naturales de nuestro patrimonio; lograr el más amplio disfrute del medio ambiente sin degradación; lograr un balance entre la población y el uso de los recursos que permita altos niveles de vida; mejorar la calidad de los recursos renovables; y velar por el uso juicioso de aquellos recursos que sufran agotamiento. 12 L.P.R.A. sec. 1123(b). Todo lo cual obedece al interés de mantener el equilibrio entre nuestro ambiente y las necesidades de nuestra sociedad.** (Énfasis nuestro.) Misión Ind. P.R. v. J.P. y A.A.A., res. el 21 de marzo de 1997, 142 D.P.R.___ (1997); 97 JTS 34, pág. 730.

Con este marco doctrinal, analicemos pues la controversia ante nuestra consideración.

III

Como ya expresáramos, el asunto que hoy nos compete va dirigido a determinar si al evaluar y aprobar una DIA-F, la Junta viene obligada a emitir una resolución que contenga determinaciones de hecho y conclusiones de derecho, conforme dispone la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2101 y ss. Comencemos, pues.

La revisión judicial de decisiones administrativas tiene como fin primordial delimitar la discreción de los organismos administrativos y asegurarse que éstos desempeñen sus funciones conforme a la ley. Miranda v. C.C.C., res. el 25 de octubre de 1996, 141 D.P.R.___ (1996); 96 JTS 137, pág. 235. Comprende tres (3) áreas: (1) la concesión del remedio apropiado, (2) la revisión de las determinaciones de hecho conforme al criterio de la evidencia sustancial y (3) la revisión completa y absoluta de las conclusiones de derecho. Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme, supra, 3 L.P.R.A. sec. 2175. Véase, además, D. Fernández Quiñones, Derecho Administrativo y Ley de

Procedimiento Administrativo Uniforme, Colombia, Editorial Forum, 1993, pág. 521. El récord o expediente administrativo constituirá la base exclusiva para la acción de la agencia en un procedimiento adjudicativo y para la revisión judicial ulterior. Véase, Sec. 3.18 de la Ley de Procedimiento Administrativo Uniforme, supra; 3 L.P.R.A. sec. 2168. Véase, además, Magriz v. Empresas Nativas, res. el 12 de mayo de 1997; 143 D.P.R.___ (1997); 97 JTS 55, pág. 944.

Al evaluar la decisión de una agencia, el tribunal debe determinar si ésta actuó de manera arbitraria, ilegal o tan irrazonable que sus actuaciones constituyeron un abuso de discreción. Fuertes v. A.R.P.E., res. el 17 de diciembre de 1993; 134 D.P.R.___ (1993); 93 JTS 165, pág. 11385. Así pues, cuando la agencia interpreta el estatuto que viene llamado a poner en vigor de forma tal que produce resultados contrarios al propósito de la ley, dicha interpretación no puede prevalecer. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., res. el 26 de noviembre de 1997; 144 D.P.R.___ (1997); 97 JTS 142, pág. 332.

Ahora bien, para que los tribunales puedan revisar una decisión administrativa, es vital que las agencias expresen claramente sus determinaciones de hecho y las razones para su dictamen, incluyendo los hechos básicos de los cuales, a través de un proceso de razonamiento e inferencia, se derivan aquéllos. Las decisiones deben reflejar que el organismo ha considerado y resuelto los conflictos de pruebas, y sus determinaciones deben describir tanto los hechos probados como los que fueron rechazados. La expresión de los fundamentos de una decisión no puede ser pro forma, y debe reflejar que la agencia ha cumplido con su obligación de evaluar y resolver los conflictos de prueba del caso ante su consideración. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra.

En procedimientos adjudicativos informales se exige que la agencia exponga una explicación de las bases sobre las que descansa su decisión, de forma que el tribunal tenga fundamentos para hacer su determinación en cuanto a si ésta es arbitraria o caprichosa. Véase,

Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265, 275 (1987).[9] Aun cuando no se exige una explicación basada en determinaciones de hecho a la manera de los procedimientos formales, en la adjudicación de procedimientos informales deben mediar razones suficientes que pongan en conocimiento a las partes y al tribunal de los fundamentos que propiciaron tal decisión. Godreau & Co. v. Com. Servicio Público, 71 D.P.R. 649, 655-657 (1950).

Entre los objetivos que se persigue para que los foros administrativos emitan determinaciones de hecho y conclusiones de derecho podemos enumerar los siguientes: (1) proporcionar a los tribunales la oportunidad de revisar adecuadamente la decisión administrativa y facilitar esta tarea; (2) fomentar que la agencia adopte una decisión cuidadosa y razonada dentro de los parámetros de su autoridad y discreción; (3) ayudar a la parte afectada a entender por qué el organismo administrativo decidió como lo hizo, y, al estar mejor informada, poder decidir si acude al foro judicial o acata la determinación; (4) promover la uniformidad intraagencial, en particular cuando el proceso decisorio institucional es adoptado por distintos miembros de un comité especial a quienes les está encomendado celebrar vistas y recibir la prueba; y (5) evitar que los tribunales se apropien de funciones que corresponden propiamente a las agencias administrativas bajo el concepto de especialización y destreza. Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265, 276-78 (1987).


IV

El alcance de nuestra intervención en casos como el que nos ocupa está expresamente definido en la Ley sobre Política Pública Ambiental.

---

[9] Sobre este particular, Rivera Santiago v. Srio de Hacienda, supra, dispuso que "[a]un cuando, … el estatuto guarda silencio y no impone al organismo administrativo la obligación de hacer determinaciones de hecho y expresar las razones para su decisión —sea un procedimiento administrativo formal o informal— como regla general tiene que hacerlo." Aclaramos, en nota al calce que no toda decisión de una agencia administrativa exige el cumplimiento riguroso de este requisito. P.N.P. v. Tribunal Electoral, 104 D.P.R. 1, 3 (1975).

Dicha ley dispone específicamente que la revisión judicial debe realizarse a base de los procedimientos ante la Junta. Señala, además, que las determinaciones de hecho de ésta serán concluyentes si están sostenidas por evidencia sustancial. Sobre este particular el Art. 14(g) de la Ley sobre Política Ambiental, supra, 12 L.P.R.A. sec. 1134(g) dispone específicamente que, **"[l]a revisión se llevará a efecto a base del récord administrativo de los procedimientos ante la Junta, según dicho récord haya sido certificado por el Secretario de la Junta. Las determinaciones de la Junta en relación a los hechos serán concluyentes si están sostenidas por evidencia sustancial."** Como bien podemos observar, el tratamiento que se le da a las decisiones de la Junta es el mismo que tiene la revisión judicial de cualquier otro organismo administrativo. Véase 3 L.P.R.A. sec. 2175.

A la luz de la norma sobre las revisión judicial en materia administrativa, la función de un tribunal en casos como el de autos es la de cotejar si la Junta ha cumplido a cabalidad con todas sus obligaciones legales y si formuló sus determinaciones fundamentadamente. Es decir, nuestro rol es verificar que ésta haya hecho un examen minucioso de las consecuencias ambientales significativas previsibles y, que a su vez, haya discutido las alternativas que razonablemente existan a la acción contemplada por la agencia proponente. Bajo este esquema, cumplimos con nuestra función de velar porque la Junta observe rigurosamente los estatutos y reglamentos que la rigen. A la vez que procuramos que se observe la política ambiental de nuestro país. Misión Ind. P.R. v. J.C.A., res. el 29 de junio de 1998, 147 D.P.R.___ (1998); 98 JTS 77, pág. 1105.

Conforme a lo antes expuesto es ineludible concluir que: (i) sólo si la Junta llega a conclusiones sobre hechos básicos y definitivos, es que los tribunales podemos ejercer nuestra función revisora; y (ii) que bajo ningún concepto nuestra función revisora tiene el alcance de obligarnos a escudriñar en el expediente administrativo para dar con las bases decisorias que utilizó la agencia para fundamentar su

decisión. **Esto es deber exclusivo de la agencia y es ésta la que tiene la insoslayable obligación de poner al tribunal en posición de poder evaluar su determinación.**

Aún así, los recurridos señalan que la Junta no viene obligada, "en este caso en particular", a hacer determinaciones de hecho y conclusiones de derecho ya que el proceso que establece el Art. 4(c) de la ley para evaluar una DIA es uno de naturaleza consultiva y no adjudicativa. En segundo lugar alegan que, mediante la aprobación de la Ley Núm. 295 de 8 de diciembre de 1998, la legislatura eximió a la Junta de tener que formular determinaciones de hecho y conclusiones de derecho en casos como el que nos ocupa. Finalmente, sostienen que ni la Ley Orgánica de la Junta ni el Reglamento sobre Declaración de Impacto Ambiental, Reglamento Núm. 3106 de 4 de junio de 1984, imponen tal requisito a la Junta. No les asiste la razón.

V

Ciertamente, la Sec. 3.1 de la Ley de Procedimiento Administrativo Uniforme, supra, 3 L.P.R.A. sec. 2151, dispone que los trámites de las declaraciones de impacto ambiental se considerarán procedimientos informales. Como tal, no tienen que cumplir con la rigidez del Capítulo III de la Ley de Procedimiento Administrativo Uniforme, supra relativo a los procedimientos adjudicativos. Véase, Exposición de Motivos de la Ley Núm. 295, supra.[10]

---

[10] El segundo párrafo de la Sec. 3.1 de la Ley de Procedimiento Administrativo Uniforme, supra, fue enmendado por la Ley Núm. 295 de 8 de diciembre de 1998. Dicha ley tuvo el propósito de incluir el proceso para la evaluación de una declaración de impacto ambiental como parte de los procedimientos informales. Sobre el particular, dicha ley dispuso lo siguiente:

> …dentro de los procedimientos informales todos los procesos de trámites de documentos ambientales establecidos en el Art. 4(c) de la Ley Núm. 9 de 18 de junio de 1970, según enmendada, conocida como "Ley sobre Política Pública Ambiental" y el reglamento aprobado al amparo de ésta por un período determinado de tiempo.

En su exposición de motivos dicha ley dispone lo siguiente:

La Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como "Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico", se aprobó con el propósito de establecer reglas y pautas, y brindarle uniformidad a los procedimientos administrativos de las agencias del Gobierno de Puerto Rico. Dentro de este marco legal se establecieron procedimientos en donde se garantizó el debido proceso en los procedimientos de las agencias administrativas.

El Capítulo III de la Ley Núm. 170, antes citado, estableció el procedimiento adjudicativo que toda agencia debe proveer y, a su vez, se eximieron ciertos procedimientos como lo son las subastas, concesión de préstamos, becas, subsidios, reconocimientos, inversiones de capital y emisiones de deuda del cumplimiento con este Capítulo. Estos procedimientos exentos se conocen como procedimientos informales que, por su naturaleza, no cumplen con la rigidez que impone el Capítulo III.

Por otro lado, el proceso de análisis y trámite de los documentos ambientales al amparo del Artículo 4(c) de la Ley Núm. 9 de 18 de junio de 1970, según enmendada, conocida como "Ley sobre de Política Pública Ambiental" es por su naturaleza de planificación e información un proceso que necesita la flexibilidad y agilidad de un procedimiento informal. Este procedimiento está regido por el Reglamento sobre Declaraciones de Impacto Ambiental aprobado al amparo de la Ley Núm. 9, antes citada.

El propósito de los documentos ambientales es describir y analizar una acción gubernamental propuesta desde el punto de vista del efecto que dicha acción pueda tener sobre el ambiente. Con dicha descripción y análisis sobre el ambiente, el ente gubernamental puede tomar decisiones informadas y, además, se realiza una divulgación a las comunidades, al público en general y las agencias concernidas.

Estos documentos ambientales, según el propio Reglamento sobre Declaraciones de Impacto Ambiental, tienen que prepararse lo antes posible dentro del proceso decisional previo a establecerse cualquier compromiso de naturaleza irrevocable de los recursos o del ambiente que grave la decisión final a tomarse. Según ha expresado el Tribunal Supremo de Puerto Rico en <u>Misión Industrial v. Junta de Calidad Ambiental</u>, 98 J.T.S. 77 (1998), el trámite de documentos ambientales bajo el Artículo 4(c) de la Ley Núm. 9, antes citada, es sólo un instrumento de planificación, siendo la primera etapa de un largo camino de autorizaciones oficiales en el desarrollo de un proyecto. Luego de superada la etapa de aprobación de un documento ambiental, la construcción y el inicio del proyecto u operación propuesto no pueden llevarse a cabo sin que se aprueben una serie de permisos que también están dirigidos a asegurar la protección ambiental.

El trámite de documentos ambientales es uno de carácter investigativo e informal y no adjudicativo al no existir un pronunciamiento en el cual la Junta de Calidad Ambiental tenga que determinar derechos u obligaciones. En el proceso de análisis de documentos ambientales tampoco

Recientemente, en <u>Colón y otros</u> v. <u>J.C.A.</u>, res. el 2 de junio de 1999, 147 D.P.R.___ (1999); 99 JTS 91, 1127, expresamos que el procedimiento de elaboración de una declaración de impacto ambiental era uno sui géneris. Señalamos que el mismo no constituye propiamente un proceso de naturaleza adjudicativa, ni tampoco constituye uno de naturaleza reglamentaria. **Sin embargo, expresamos que cuando, durante la celebración de una vista pública en la que se considera una declaración de impacto ambiental, se presenta ante la Junta un asunto que requiera ser adjudicado por no ser un mero comentario, y conforme al mandato de su ley orgánica, la Junta tiene que resolverlo y notificar su determinación a las partes interesadas.**

El procedimiento para aprobar una declaración de impacto ambiental es uno informal que, de ordinario, no constituye propiamente un proceso de naturaleza adjudicativa. Sin embargo, no podemos olvidar que el mismo es uno sui géneris, que también goza de **carácterísticas adjudicativas.** Nótese que, cuando la Junta considera y resuelve una

existe controversia o conflicto entre dos (2) o más partes. Por el contrario, este trámite es uno investigativo en donde las agencias envueltas se cercioran de que se cumpla con las disposiciones de sus respectivas leyes o reglamentos.

La enmienda a la Sección 3.1 de la Ley Núm. 9, antes citada, no afecta los derechos de las personas a expresarse pues existen garantías para la participación pública, a la vez, se logra un balance para mantener la agilidad y eficiencia del proceso de trámite de documentos ambientales.

Por las razones antes expuestas, es necesario durante un período de tiempo que permita evaluar la eficiencia de la misma enmendar la Ley Núm. 170, antes citada, en su Sección 3.1 para que los procedimientos bajo el Artículo 4 (c) de la Ley Núm. 9 antes citada, sean informales y cónsonos con la realidad del trámite y análisis de los documentos ambientales. Sin embargo, la reconsideración de las decisiones emitidas dentro de los procedimientos informales estarán sujetas y se regirán por lo dispuesto en la Sección 3.15 de la Ley Núm. 170, antes citada.

Transcurridos 120 días de aprobarse tal enmienda la Junta de Calidad Ambiental le informará a la Asamblea Legislativa el impacto que la misma ha tenido sobre la agilización del trámite y la exposición ambiental de mantener que esta última considere la posibilidad de extender preventivamente la vigencia a las enmiendas.

solicitud de declaración de impacto ambiental, está ejerciendo poderes cuasi-judiciales. En estos casos en específico la Asamblea Legislativa provee para la celebración de una vista la cual, se torna cuasi judicial debido a que en la misma le corresponde a la Junta aquilatar la prueba, documentos y argumentos de los participantes, además, de salvaguardar las garantías mínimas del debido proceso de ley. Véanse, Henríquez v. Consejo Educación Superior, 120 D.P.R. 194, 202 (1987); Ortiz Cruz v. Junta Hípica, 101 D.P.R. 791, 795 (1973). Finalmente, la decisión que emita la Junta, sea o no considerada informal, está sujeta a reconsideración, conforme dispone la Sec. 3.15 de la Ley de Procedimiento Administrativo Uniforme. Véase, Ley Núm. 295 de 8 de diciembre de 1998. Más aún, la decisión está sujeta a revisión judicial. Al proveerse para una revisión judicial, no bastan un récord de la prueba y una simple decisión. Las conclusiones deben ser lo suficientemente definidas como para poner a los tribunales en posición de determinar si los hechos, tal y como los encontró probados la Junta, ofrecen una base razonable para tal resolución.

A la luz de lo antes expuesto resolvemos que, en virtud de que el procedimiento de declaración de impacto ambiental que preside la Junta es uno sui géneris que participa de ciertas características propias de un proceso adjudicativo, ésta viene obligada a emitir su determinación fundamentada. Es decir, con aquella evidencia que **"una mente razonable pueda aceptar como adecuada para sostener una conclusión"**. Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953). Evidencia que, a su vez, sirva de base para que los tribunales puedan ejercer su función revisora.

Cabe señalar que el que la Ley Núm. 295, supra, flexibilice el procedimiento de declaración de impacto ambiental para hacerlo más rápido no conlleva el eximir a la agencia de cumplir con su deber de emitir una resolución en la cual fundamente su dictamen y lo haga revisable ante los tribunales. A la luz de lo antes expuesto, es forzoso concluir que en el caso de autos procedía el que la Junta

emitiera una resolución que tuviera determinaciones de hecho y conclusiones de derecho.

Por los fundamentos antes expuestos, se expide el auto solicitado, se revoca la sentencia emitida por el Tribunal de Circuito de Apelaciones y se devuelve el caso a la Junta de Calidad Ambiental para que proceda conforme a lo aquí resuelto.[11]

MIRIAM NAVEIRA DE RODÓN
Juez Asociada

---

[11] En virtud del resultado al que hemos llegado se hace inmeritorio que consideremos los restantes errores.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de San Juan

    Peticionario

      v.

                          CC-1999-496

Junta de Calidad Ambiental
Administración de Reglamentos y
Permisos/Corp. de Desarrollo
Hotelero Development Management
Group, Inc.

    Recurridos

SENTENCIA

San Juan, Puerto Rico a 5 de octubre de 1999

    Por los fundamentos antes expuestos, se expide el auto solicitado y se dicta sentencia revocando la emitida por el Tribunal de Circuito de Apelaciones. Se devuelve el caso a la Junta de Calidad Ambiental para que proceda conforme a lo aquí resuelto.

    Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García disintió con opinión escrita a la cual se unió el Juez Asociado señor Rebollo López. El Juez Asociado señor Corrada del Río disiente por entender que la decisión emitida el 30 de junio de 1999 por el Tribunal de Circuito de Apelaciones mediante la cual confirmó la resolución de la Junta de Calidad Ambiental en cuanto a la DIA-F para el proyecto Condado Beach Resort, es esencialmente correcta y debió ser confirmada por este Tribunal.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de San Juan

    Peticionario

       v.

                            CC-1999-496     Certiorari

Junta de Calidad Ambiental

Administración de Reglamentos y

Permisos

Corporación de Desarrollo Hotelero

Development Management Group, Inc.

    Recurridos

Opinión Disidente del Juez Asociado señor Negrón García a la cual se une el Juez Asociado señor Rebollo López

San Juan, Puerto Rico, a 5 de octubre de 1999

    **Examinamos sólo la juridicidad de los planteamientos del peticionario Municipio de San Juan en torno al proyecto denominado "Condado Beach Resort".** Incluso, en el ámbito

estrictamente personal, podríamos tener reservas.[12] Aun así, nos abstenemos de enjuiciar su sabiduría frente a la alternativa municipal propuesta. En última instancia será la opinión ciudadana basada en otros criterios, valores, expectativas y percepciones legítimas, pero ajenas propiamente al quehacer judicial, la que juzgue como correcta o equivocada esa decisión.

---

[12] Tomamos conocimiento judicial de personas que se oponen a la demolición de la estructura del Hotel La Concha, bajo la visión de que debe ser preservada como parte del patrimonio histórico arquitectónico

Delimitando así el ámbito de nuestra función judicial revisora, no podemos suscribir la respetada, pero rígida opinión mayoritaria. Su exclusiva razón de decidir (<u>ratio decidendi</u>) se apuntala en una sola conclusión producto de un **automatismo judicial novel**, desasociado de la particular realidad y dinámica procesal –acumulativamente escalonada, en etapas–, que por su propia naturaleza conlleva toda Resolución de la Junta de Calidad Ambiental al aprobar o denegar una **Declaración de Impacto Ambiental Final (DIA-F)**. Como resultado de ese enfoque riguroso, la mayoría pospone innecesariamente la solución en los méritos del recurso y deja **paralizada** (en "veremos"), por varios meses más el destino de esta obra.

**Primero**, distinto a la conclusión mayoritaria, el **formato clásico** sobre determinaciones de hecho y conclusiones de derecho separados –**amén de no serle exigido por la Ley de Procedimiento Administrativo Uniforme (LPAU)**[13]**– (nunca antes se había requerido a la Junta de Calidad Ambiental)**, es inaplicable a la gestión encomendádale por la Ley Sobre Política Ambiental.[14] **Segundo**, a poco profundicemos, veremos que la Resolución que nos ocupa **no es pro-forma sino que contiene sustantiva y procesalmente abundante especificación fáctico-legal**, suficiente para **este foro descargar su obligación judicial adjudicativa**. Tan es así, que

_____

puertorriqueño. Al respecto, el Colegio de Arquitectos de Puerto Rico presentó ante la Junta de Planificación una nominación para que fuese declarado "Sitio Histórico". La Junta de Planificación adoptó la recomendación del Comité Asesor de Sitios y Zonas Históricas que, luego de una inspección ocular, resolvió por unanimidad no designarlo. El Comité concluyó que no cumplía con el requisito de cincuenta (50) años de construcción, ni con el valor excepcional de los siete (7) criterios de elegibilidad establecidos en el Registro de Sitios y Zonas Históricos.

Oportunamente el Colegio de Arquitectos presentó recurso de revisión ante el Tribunal de Circuito de Apelaciones. Éste descartó los argumentos del Colegio y denegó el recurso por entender que no se había demostrado que la Junta abusó de su discreción.

Acudió ante nos (CC-1999-16) y el 26 de febrero de 1999 coincidimos con el Tribunal de Circuito y proveímos no ha lugar a dicho recurso.

[13] Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. sec. 2101 <u>et. seq.</u>

no fue obstáculo alguno para que el Municipio de San Juan haya podido discutir y elaborar plenamente sus señalamientos de error ante el reputado Tribunal de Circuito de Apelaciones (Hons. Alfonso de Cumpiano, ponente; Aponte Jiménez y Giménez Muñoz), y este foro. **Tercero**, la conclusión mayoritaria descansa **en un planteamiento académico en esta etapa**. Del mismo modo que no impidió al Tribunal de Circuito, no nos impide, ni es impedimento para ahora, examinar y decidir el recurso **en sus méritos**. Fundamentemos.

I

El Capítulo III de la **LPAU** rige todos los procedimientos **formales** de agencias administrativas cobijadas por la misma Ley. Específicamente, su sección 3.14 requiere que **sólo las decisiones en procedimientos formales incluyan y expongan separadamente determinaciones**

---

[14] Ley Núm. 9 de 18 de junio de 1970, 12 L.P.R.A. sec. 1122 <u>et. seq.</u>

**de hecho y conclusiones de derecho**. Confrontados con **ese mismo mandato**, en Colón Cortés v. Junta de Calidad Ambiental, res. en 2 de junio de 1999, 99 TSPR 85, resolvimos que el procedimiento de elaboración de una DIA es **sui generis, que no constituye propiamente un procedimiento adjudicativo ni reglamentario**. La propia Ley lo clasifica como **informal**, por lo que **de iure** lo exceptúa del cumplimiento estricto con  las disposiciones del aludido capítulo. No obstante, en Colón Cortés, supra, ratificamos que el debido proceso en trámites administrativos donde se adjudican controversias o se toman determinaciones que afecten partes, exige se consiguen determinaciones o fundamentos que puedan ser revisadas por los tribunales. Rivera Santiago v. Scrio de Hacienda, 119 D.P.R. 265 (1987). **Esto nunca ha significado que sea necesario que la Junta de Calidad siga el formato tradicional de determinaciones de hecho y conclusiones de derecho separadas, sino una resolución fundamentada con suficiente exposición fáctica-procesal y en derecho, para que las partes puedan recurrir de su determinación y los tribunales podamos evaluarla**. Lógicamente, la suficiencia de la Resolución debe verse en el contexto de los procedimientos **sui generis** y dinámica peculiar que la Junta de Calidad atiende.

**Ésta fue la postura que este Tribunal asumió en** Misión Industrial v. Junta de Calidad Ambiental, res. en 29 de junio de 1998, 98 TSPR 85, al evaluar la juridicidad de una **DIA-F** aprobada para la construcción y operación de una planta de cogeneración de energía. Allí **-al igual que en el presente caso-**, sin que existiese una Resolución **con formato clásico** que contuviese determinaciones de hecho y conclusiones de derecho **separadas**, este Tribunal en el fiel descargo de su responsabilidad examinó y adjudicó los méritos de cada uno de los planteamientos del peticionario Misión Industrial, mediante un análisis concienzudo de la Resolución, DIA, información y demás documentos obrantes en el expediente administrativo.

En aquella ocasión la Resolución de la Junta de Calidad consistió

de un trasfondo procesal y fáctico, descripción del proyecto y discusión de sus aspectos más significativos. La Resolución expresaba que las circunstancias recogidas en el Informe del Panel Examinador se encontraban adecuadamente atendidas en la Declaración de Impacto Ambiental Preliminar **(DIA-P)** y se cumplían cabalmente con los requisitos del Art. 4(c) de la Ley Núm. 9.

**Como veremos, la Resolución de la Junta en el caso ante nos sigue básicamente esa misma metodología expositiva y llega a igual resultado, expresado de forma idéntica. Si en <u>Misión Industrial</u> v. <u>J.C.A.</u>, <u>supra</u>, no tuvimos reparos en examinar el expediente administrativo para determinar si fáctica y en derecho las conclusiones de la Junta de Calidad estaban sustentadas por los documentos que le fueron presentados, no existe razón ni justificación alguna para ahora, <u>en este caso</u>, apartarnos de ese precedente adoptando un curso de acción distinto que sólo generará más demora, gastos e incertidumbre.**

II

Un análisis de la ley y jurisprudencia aplicable refleja que la función inicial de la Junta de Calidad es velar por la adecuacidad de la **DIA-P,** confirmando que el trámite de evaluación y consulta se haya efectuado **conforme a lo requerido por la Ley y su Reglamento instrumentador.**[15]

---

[15] El Art. 4(c) de la Ley Sobre Política Pública Ambiental requiere que antes de efectuarse cualquier acción o promulgarse cualquier decisión gubernamental que afecte significativamente la calidad del ambiente, se prepare una declaración escrita sobre los impactos ambientales de la acción propuesta. <u>Salas Soler</u> v. <u>Scrio. de Agricultura</u>, 102 D.P.R. 716, 720 (1974); <u>Misión Industrial de P.R.</u> v. <u>Junta de Calidad Ambiental de P.R.</u>, res. en 30 de junio de 1998, 98 TSPR 86.

En esta declaración, **la agencia gubernamental** proponente tiene la obligación de considerar y detallar por escrito todas las consecuencias ambientales significativas vinculadas a la acción propuesta. A tal efecto, debe realizar un esfuerzo serio y escrupuloso por identificar y discutir todas las consecuencias ambientales de importancia que sean previsibles. No es necesario examinar impactos remotos, triviales o especulativos, sino aquellos que el especialista en la materia concienzudamente estima que deben detallarse. <u>Misión Industrial de P.R. Inc.</u>, <u>supra</u>.

La Ley Núm. 9 manda que la DIA incluya una discusión de los pasos que puedan tomarse para mitigar las consecuencias ambientales adversas que generaría la acción propuesta de ser implantada. La declaración

Dentro de este marco, la Resolución de la Junta de Calidad expondrá los requisitos legales que deben cumplirse y si, en efecto, se cumplen o no. Por cada requisito existe una determinación de hecho y derecho que puede ser impugnada; **no le requiere que a modo de recital (por no decir ritual), vierta todo el contenido de la DIA-F en su Resolución.**

**Por otra parte, al examinar tales determinaciones de hecho o conclusiones de derecho debemos tener presentes que la evaluación de una DIA-F es la culminación de un proceso escalonado en el que acumulativamente, por etapas, se emiten varias resoluciones. La meta es que la agencia proponente cumpla con todos los requisitos impuestos por ley. Por tanto, la decisión final (Resolución) de la Junta de Calidad debe verse de forma integral, pues incorpora todas las determinaciones hechas en el transcurso del proceso. Así en el caso de autos, luego de la presentación y preparación de la DIA-P, la Resolución emitida acogió**

---

debe contener, además, una discusión de las alternativas a la acción propuesta, sin que sean necesario examinar todo tipo de proyecto alterno concebible. Lo esencial es que quede demostrado que el curso de acción propuesto es, en balance, el de menor impacto ambiental **a la luz de todos los factores legítimos pertinentes.**

Por esta razón nuestro ordenamiento jurídico no exige, al examinar una declaración de impacto ambiental (DIA) que la Junta de Calidad haga un análisis matemático preciso o perfecto que garantice que el proyecto propuesto no ha de tener impacto ambiental adverso alguno. **Lo que se persigue es que la declaración provea información suficiente que ponga en perspectiva las consecuencias, tanto favorables como desfavorables, de la acción gubernamental propuesta.** Misión Industrial de P.R. Inc., supra.

Al evaluar una declaración de impacto ambiental sometida por la agencia originadora el deber de la **Junta de Calidad no consiste en aprobar o desaprobar el proyecto en cuestión, sino en decidir si la declaración de impacto ambiental es adecuada para la acción propuesta.** Su encomienda no es aprobar un proyecto u otorgar un permiso, sino de evaluar si la declaración es adecuada para acreditar que la agencia proponente tomó en consideración las cuestiones ambientales, según requerido por la Ley de Política Pública Ambiental. Misión Industrial de P.R. Inc., supra.

Estos parámetros no significan que la Junta de Calidad sea un mero observador del proceso de análisis. Tiene la facultad de opinar sobre las bondades y deficiencias de determinado proyecto y publicar sus opiniones. Si considera que la DIA es incompleta, puede así señalarlo. Si tiene dudas sobre algunos datos o juicios, puede expresarlas. Incluso, puede expresar su desacuerdo con la acción propuesta de entender que la misma no es aconsejable desde el punto de vista ambiental. **Pero conforme el mandato legislativo ahí acaban sus funciones.** El proceso de tramitación de la DIA no la faculta para decidir ultra vires si la acción gubernamental debe o no debe ser

**e incorporó las determinaciones del Oficial Examinador.**

Al respecto, luego de **esbozar específicamente los requisitos de ley, concluyó:**

"Como elemento de imprescindible consideración, es importante hacer hincapié que el área que se vería afectada por este proyecto ha sido utilizada para fines similares por décadas por lo que el proyecto ante nuestra consideración no varía sustancialmente los usos existentes.

Podríamos coincidir o estar en desacuerdo con el diseño propuesto. Inclusive podríamos favorecer otros proyectos de desarrollo turístico que han sido propuestos. Sin embargo, ese no es nuestro rol dentro de este proceso de análisis ambiental. **Nuestra función se limita a determinar si el trámite de evaluación y consulta se haya dado conforme a lo requerido por la ley y su reglamento instrumentador, bajo los principios de derecho que hemos discutido anteriormente.**

Es nuestra opinión que el documento de Declaración de Impacto Ambiental, en su etapa preliminar, **cumple el propósito principal de servir de instrumento de planificación para lograr que en el proceso decisional gubernamental se incorpore la política pública ambiental enunciada en la ley.**

Sin embargo, **aún carece de cierta información necesaria para** cumplir con los requisitos del Art. 4(c) de la Ley Sobre Política Pública Ambiental y sus reglamentos instrumentadores.

**Los aspectos** que estimamos **deben ampliarse** en el documento final son los siguientes:

1. Deben incorporarse al documento final y proveerse contestación a los distintos comentarios vertidos por la ciudadanía relacionados a la adecuacidad del documento de DIA-P.

2. Incluir en el documento carta del Municipio de San Juan aceptando la disposición final de los desperdicios sólidos no peligrosos en el vertedero o se analicen otras alternativas como lo sería la posibilidad del reciclaje.

3. La figura #5, Mapa de Suelos, deberá ser sustituida por una copia más clara.

4. La DIA-P no discute los posibles efectos que el proyecto propuesto pueda tener sobre la zona marítimo terrestre (aunque el Departamento de Recursos Naturales y Ambientales en su carta del 30 de enero de 1998 le requiere que comente el mismo). La DIA-P discute someramente sobre la ZMT en el Apéndice 4 y alega que no la va a implantar. Debe proveerse una discusión adecuada de estos posibles impactos.

5. Las alternativas discutidas en la DIA-P son bien someras y solamente se discuten la opción de no construir, la opción del proyecto y una tercera opción que es restaurar el complejo en su forma presente. La discusión de las alternativas deben de ser más extensas e incluir más alternativas.

6. El impacto de emisiones de polvo fugitivo a la atmósfera y ruido al momento de construirse el nuevo complejo no se discute ampliamente. Debe ampliarse el análisis de este posible impacto ambiental.

7. Las cartas con las recomendaciones u observaciones de las Agencias gubernamentales consultadas deben estar en el documento. De igual forma deben incluirse los comentarios escritos presentados por la

realizada. Esto le compete a la agencia originadora y, a todas aquellas que tengan la facultad de emitir permisos.

ciudadanía durante el proceso de consulta.

8. Se deberá discutir el impacto en el tránsito de la operación de las facilidades propuestas. Este aspecto es de gran importancia pues tomamos conocimiento oficial de los graves problemas de tránsito vehicular que han afectado por años el área impactada.

9. Impacto durante el proceso de demolición por implosión de los edificios contiguos al Edifico Condado Vandervilt. Deberá presentar y discutir las medidas a tomarse para evitar que se afecte el edificio Condado Vandervilt en su estructura y cimientos. Estudiar la estabilidad de los suelos.

10. Deben discutirse de forma clara en que consisten las obras de restauración del Edificio Condado Vandervilt. La DIA-P sólo menciona la frase 'dentro de lo posible' sin especificar el carácter de las obras a realizarse.

11. Durante la vista se presentó por el proponente una comparación de los efectos de los edificios existentes y los propuestos respecto a la sombra que imparten a la zona de playa. Estos datos no son discutidos en la DIA-P y son de interés de los deponentes en la Vista Pública.

. . .

De igual manera recomendamos se requiera a la agencia proponente que incorpore a la Declaración de Impacto Ambiental Final una discusión de los comentarios hechos por cada una de las agencias consultadas y por el público en general."

Subsiguientemente, el 2 de marzo de 1999 la Junta de Calidad aprobó la DIA-F, vía **Resolución**, que expresamente incorporó el segundo Informe del Oficial Examinador. Esta Resolución decretaba el cumplimiento de todos los requisitos de ley,[16] atendiendo

---

[16] A tenor con el Reglamento de Declaraciones de Impacto Ambiental, la DIA deberá incluir una descripción general de la acción contemplada, su propósito y necesidad y una descripción del ambiente que podría ser directa o indirectamente afectado por la acción propuesta en la medida que sea relevante. Dicha descripción incluirá, entre otras cosas:

a. Las características físicas y químicas del medio ambiente así como los componentes bióticos y sus fluctuaciones periódicas, distribución, abundancia relativa, cadenas alimenticias, habitáculos y las relaciones entre las especies existentes.

b. Tendencias de desarrollo y población del área bajo consideración y cualquier información relacionada con estas variables que pueda justificar la acción o determinar los impactos secundarios resultantes.

De igual manera deberá contener una discusión del probable impacto ambiental de la acción propuesta que incluya, entre otros, los siguientes aspectos según resulten relevantes:

a. Una evaluación de los efectos primarios y secundarios, ya sea positivos o negativos, de la acción propuesta sobre aspectos ambientales tales como: el bienestar y la salud humana, usos de terreno, infraestructura, calidad del aire y del agua, minerales económicos, la flora, la fauna, los suelos las áreas inundables, las especies amenazadas o en peligro de extinción, los niveles de sonido y los objetos o áreas de valor histórico, arqueológico o estético.

específicamente las deficiencias que habían sido señaladas en el Informe anterior.

La **Resolución** incorporó el Informe Suplementario del Oficial Examinador, enumeró nuevamente la información adicional requerida

---

b. Una descripción y evaluación de los posibles agentes contaminantes de cualquier tipo a generarse y/o emitirse, verterse o disponerse de cualquier modo al medio ambiente durante el desarrollo, implantación y operación de la acción propuesta.

c. Discutir la manera en que la acción propuesta armoniza o conflige los otros objetivos y términos específicos de los planes vigentes sobre usos de terreno, política pública aplicables y controles del área a ser afectada.

d. Identificar y discutir cualquier impacto ambiental adverso que no pueda ser evitado de llevarse a cabo la acción propuesta y aquellas medidas que serán tomadas para reducir dicho impacto.

e. Justificar el uso propuesto de los recursos si este pudiera interferir con otros usos potenciales de las generaciones futuras.

f. Cualquier compromiso irrevocable e irreparable de recursos involucrados en la acción.

g. Los aspectos o valores ecológicos, históricos, arqueológicos, fisiográficos únicos que pudieran afectarse.

h. Los planes de desarrollo que pudieran afectarse por la decisión o la acción bajo consideración en la DIA.

i. Los factores socioeconómicos de la acción propuesta.

j. Un análisis que considere los efectos ambientales de la acción propuesta, las medidas necesarias y disponibles para evitar o reducir los efectos ambientales adversos y los beneficios a derivarse de dicha acción.

Como otro aspecto fundamental, el documento de DIA deberá presentar a manera de comparación, el impacto ambiental de la acción propuesta y de sus alternativas, de manera que se precisen las cuestiones bajo evaluación y se provean alternativas de selección. En atención a esta norma general, el documento ambiental deberá:

a. Considerar y evaluar objetivamente toda alternativa razonable, exponer en forma concisa las razones para excluir aquellas alternativas que sean eliminadas de evaluación detallada.

b. Dar consideración substancial a cada alternativa evaluada en forma detallada, incluyendo la acción propuesta, de manera que las personas que utilicen la DIA puedan evaluar y comparar los méritos de cada alternativa.

c. Incluir alternativas razonables que no estén dentro de la programación de la agencia proponente, a tenor con los planes de desarrollo de la región.

ch. Incluir la alternativa de no llevar a cabo la acción propuesta.

d. Identificar la alternativa preferida por la agencia proponente en la DIA Preliminar.

e. Incluir las medidas de mitigación de efectos adversos al ambiente no discutidas en la acción o en las alternativas propuestas.

previamente a los proponentes del proyecto y **concluyó que cada una de las deficiencias había sido subsanada con la información adicional incorporada en la DIA-F. Además, listó y consignó una serie de conclusiones y permisos necesarios antes de dar comienzo a la construcción o efectuar algún movimiento de tierra.**[17] Finalmente determinó que se cumplía con todos los requisitos del Art. 4(c) de la Ley Sobre Política Pública Ambiental y sus reglamentos instrumentadores.

III

**Ante este trasfondo, es errónea, por no decir incomprensible, la conclusión mayoritaria de que la Resolución de la Junta de Calidad adolece de falta de determinaciones o conclusiones de derecho.** El debido

procedimiento no requiere un formato, sino sustancia, esto es, fundamentos fácticos y legales suficientes que apoyen la decisión administrativa para que los afectados puedan evaluarla y recurrir ante los tribunales, y estemos en posición de revisarla.

**La especificidad de la Resolución aquí envuelta -en términos de determinaciones fácticas y legales-, es tan evidente que no ha sido obstáculo ni impedimento alguno para el peticionario Municipio de San Juan -tanto en el Tribunal de Circuito, como ante este foro-, impugnar y discutir en el recurso las tres determinaciones esenciales con las cuales esta en desacuerdo, a saber: (1) adecuacidad al discutir las alternativas al proyecto propuesto; (2) su impacto en el tránsito, y,**

---

[17] **Es en la etapa de obtener los particulares permisos de construcción y de operaciones que se fijan concretamente los controles de contaminación necesarios. En esa etapa la Junta de Calidad, otras agencias concernidas, las partes interesadas y los propios tribunales tienen de modo muy particular el deber y la responsabilidad de velar porque se cumpla rigurosamente con la política pública ambiental del país. Además, aún después de haber comenzado las operaciones, si el proyecto contemplado por la agencia proponente no se desarrolló o se llevó a cabo según descrito en la declaración de impacto ambiental (DIA), o si las consecuencias ambientales previstas en dicha declaración han resultado ser más graves que lo anticipado, o si surgen impactos adversos no previstos, la Junta de Calidad Ambiental tiene la facultad y el deber de tomar todas las medidas adecuadas para evitar cualquier daño al ambiente o a los recursos naturales que pueda ocurrir; en otras palabras, el hecho de que la Junta de Calidad haya aprobado antes una declaración de impacto ambiental (DIA) en modo alguno impide que tome tales medidas. Misión Industrial de P.R. Inc., supra.**

**(3) el carácter específico de la obra a realizarse en la renovación del Condado Vandervilt.**

Ante estos y otros planteamientos específicos, el Tribunal de Circuito siguiendo el precedente de <u>Colón Cortés</u>, <u>supra</u>, analizó meticulosamente la Resolución y el expediente administrativo bajo el crisol de nuestra doctrina jurisprudencial ambiental. Correctamente determinó que, conforme los criterios de **evidencia sustancial** y **deferencia**, la Junta de Calidad dio fiel cumplimiento a ley y a las normas reglamentarias que rigen la aprobación de una DIA-F. Concluyó que no había errado o abusado de su discreción y su determinación encontraba apoyo en el expediente administrativo.

IV

**En los méritos, desde este estrado, bajo las normas de revisión judicial, con el beneficio del razonado y documentado dictamen del Tribunal de Circuito, (consta de 37 páginas), -sin necesidad al decir mayoritario de "escudriñar" (Opinión del Tribunal, pág. 16) el expediente administrativo-, sino analizarlo a la luz de la Resolución y demás dictámenes emitidos por la Junta de Calidad unidos al expediente administrativo, no encontramos base jurídica-racional para llegar a un resultado diferente.**

**Rehusamos pues, seguir la ruta decisoria mayoritaria. Escogemos evaluar el contenido y la sustancia del recurso, no posponerlo poniéndole una etiqueta de papel, requiriendo en esta etapa avanzada, no sólo lo que la Ley no exige, sino un "formato" innecesario y fútil.**

Sobre los tres señalamientos de error dirigidos a los méritos, nuevamente reproducidos ante nos por el Municipio de San Juan, coincidimos con el Tribunal de Circuito. Examinémoslos sucintamente.

**Planteamiento sobre Alternativas:** Fundamentado en la Ley Núm. 9, el Reglamento de Declaraciones de Impacto Ambiental, y nuestra jurisprudencia, -<u>Misión Industrial</u> v. <u>Junta de Calidad Ambiental</u>, <u>supra</u>; <u>Misión Industrial</u> v. <u>Junta de Planificación</u>, <u>supra</u>-; y en federal, -<u>Vermont Yankee Nuclear Power Corp.</u> v. <u>Natural Resources</u>

Defense Council, 435 U.S. 519 (1978); Natural Resources Defense Council, Inc. v. Morton, 458 F. 2d 827 (D.C. Cir (1972)); Natural Resources Defense Council Inc. v. Callaway, 524 F. 2d 79 (2do. Cir (1975)); Grazing Fields Farms v. Goldschmidt, 626 F. 2d 1068 (1er Cir (1980)), All Indian Pueblo Council v. U.S., 975 F. 2d 1437 (10mo Cir (1992)); y Concerned Citizens Alliance, Inc. v. Slater, opinión del 14 de mayo de 1999, 1999WL301734, (3er Cir (Pa.))- **dictaminó que no existe obligación de discutir todas las alternativas, siempre que medie el criterio de razonabilidad.**

Concluyó que la Junta de Calidad determinó que medió cumplimiento en la consideración de las alternativas. A este criterio debe dársele deferencia, particularmente cuando **el récord no surge en qué medida otras alternativas no discutidas conllevarían un impacto ambiental menos severo que la acción propuesta.**

Coincidimos plenamente con el Tribunal de Circuito que los señalamientos del Municipio de San Juan en cuanto a la discusión de las alternativas, no alcanzan el grado de irrazonabilidad, arbitrariedad o ilegalidad que permita judicialmente variar el dictamen de cumplimiento con los requisitos de las declaraciones de impacto ambiental.

**Planteamiento de la Evaluación del Impacto del Proyecto en el Tránsito**: No hay base real en el expediente para concluir que el peso otorgado por la Junta de Calidad en la aprobación de la DIA-F al estudio de tránsito utilizados por los promoventes **(Estudio de Plummer)** es insuficiente en ley o irrazonable, sobre todo, cuando no se reconoce por ley o reglamento los métodos que deben utilizarse en un estudio de tránsito. **Tampoco consta en el expediente un estudio de tránsito que demuestre que el de Plummer es incorrecto o que contrarreste la determinación de la Junta de Calidad.**

En ausencia de evidencia sustancial que derrotara los hallazgos del estudio que obran en el expediente, el Tribunal de Circuito -lo mismo que esta Curia- esta impedido de intervenir con esa determinación.

**Planteamiento sobre el Carácter de la Renovación del Condado Vandervilt**: La DIA-F incluyó suficiente información que explica en que consisten las medidas preventivas para proteger el edificio. Especificó la información respecto a las obras a efectuarse, a saber ventanas más grandes con vista al mar, remodelación del interior para acomodar setenta y una (71) habitaciones de tiempo compartido, piscina, acceso a la playa y conexión por el oeste con un edifico nuevo de apartamentos. Explicó que la estructura exterior sería renovada a su diseño original.

**Finalmente la DIA-F reconoció el valor histórico y cultural del edificio y el proponente se comprometió a respetar ese valor.**

En resumen, evaluado el expediente, récord administrativo y la Resolución de la Junta de Calidad a la luz de nuestra doctrina jurisprudencial administrativo-ambiental vigente, el Municipio de San Juan no tiene razón.

**Debimos confirmar en los méritos.**

ANTONIO S. NEGRÓN GARCÍA
Juez Asociado