TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos el ex-agente Femando Colón Trinidad (en adelante, Colón) y nos solicita la revisión de la Resolución emitida por la Comisión de Investigación, Procesamiento y Apelación (en adelante, C.I.P.A.) el 5 de agosto de 2003, notificada el 19 de septiembre de 2003. Mediante dicha resolución, la C.I.P.A. confirmó la expulsión de Colón del Cuerpo de la Policía de Puerto Rico.
El 8 de octubre de 2003, Colón presentó “Moción de Reconsideración y Solicitud de Producción de Acta” ante la C.I.P.A. El 14 de octubre de 2003, notificada el 7 de noviembre de 2003, la C.I.P.A. emitió Resolución en la que declaró “no ha lugar” la solicitud de reconsideración.
*147 A continuación, expondremos el trasfondo fáctico y procesal de caso.
I
Colón se desempeñaba como Agente de la Policía de Puerto Rico (en adelante, la Policía), adscrito al Depósito de Armas, en el Cuartel General, localizado en Hato Rey.
El 17 de septiembre de 2001, el entonces Superintendente de la Policía, le dirigió una caita a' Colón en la que le informaba que se le suspendía sumariamente de empleo y sueldo. Dicha determinación obedecía a que el 10 de agosto de 2001, tuvo lugar un incidente entre Colón y los ex-agentes Nathaniel Guzmán Cruz y Abdiel Ríos López (en adelante, “los Ex-Agentes”), quienes en ese entonces estaban adscritos a la División de Drogas, Área Metro. Ese día, los Ex-Agentes intervinieron con Colón en la Carretera 167, jurisdicción de Bayamón, y éste alegadamente los agredió, los escupió en la cara, les profirió palabras soeces, insultantes y ofensivas y amenazó de muerte al ex-agente Abdiel Ríos López. En contra de Colón se presentaron denuncias por violaciones a los Artículos 95, 239 (B), 258 y 260 del Código Penal de Puerto Rico. 
Por estos hechos, a Colón se le imputaron varias faltas administrativas, las cuales consistían en la violación del Artículo 14, Sección 14.5, Faltas Graves Número 1, 2, 9, 10, 17 y 27, del Reglamento de Personal de la Policía de Puerto Rico. Dichas disposiciones reglamentarias establecían lo siguiente:

“FALTA GRAVEl:

Demostrar incapacidad manifiesta, ineptitud, descuido, parcialidad o negligencia en el desempeño de sus deberes, funciones y responsabilidades.

FALTA GRAVE 2:

Amenazar con, o hacer uso de un arma de fuego contra cualquier persona, excepto en casos de legítima defensa propia o la de un semejante.

FALTA GRAVE 9:

Usar lenguaje ofensivo, impropio o denigrante contra el Gobernador, Miembros de la Legislatura, Rama Judicial, Rama Ejecutiva, Agencia, Instrumentalidad del Estado Libre Asociado de Puerto Rico, Miembros de la Fuerza, Funcionarios y Empleados de la Policía, o cualquier otra institución debidamente constituida o contra cualquier ciudadano en particular.

FALTA GRAVE 10:

Realizar actos por los cuales fuere convicto en un tribunal de justicia competente de delito grave o delito menos grave que conlleve depravación moral, o por violación de los derechos civiles de un ciudadano.

FALTA GRAVE 17:

Ridiculizar, censurar o criticar adversamente por escrito u oralmente, en público o privado, las actuaciones directivas, determinaciones u órdenes legales de cualquier organismo judicial o cuasi judicial, funcionario público, o miembro de la Fuerza con autoridad para emitir órdenes.

FALTA GRAVE 27:

Observar una conducta lesiva, inmoral o desordenada en detrimento del cuerpo de la Policía. ”

*148 Conforme a lo anterior, el Superintendente de la Policía le advirtió a Colón de su intención de expulsarlo del puesto que ocupaba en la Policía. Por otro lado, se le apercibió de su derecho a solicitar una vista administrativa.
En la acción criminal contra Colón, el 24 de abril de 2002, el Tribunal de Primera Instancia, Sala Superior de Bayamón, le declaró “no culpable” por los delitos del Artículo 95 y 239 (B) del Código Penal de Puerto Rico. Del expediente no surge documento alguno que demuestre si, en efecto, Colón fue procesado por las alegadas violaciones a los Artículos 258 y 260 del Código Penal de Puerto Rico y de haber sido así, cuál fue el fallo en esos casos.
El 17 de mayo de 2002, luego de celebrada la vista administrativa solicitada por Colón, el Superintendente le dirigió una carta en la que le indicó que estaba expulsado del puesto que ocupaba en la Policía, retroactivo a la fecha de la notificación de la suspensión sumaria.
El 18 de junio de 2002, Colón presentó escrito de apelación ante la C.I.P.A. Alegó que la expulsión no estaba basada en fundamento legal alguno que sustentara dicha determinación.
La C.I.P.A. celebró vista administrativa los días 6 y 7 de mayo de 2003. De acuerdo a la transcripción de la vista, el ex-agente Nathaniel Guzmán Cruz declaró lo siguiente:

“...Nos dirigimos hacia la División de Operaciones Tácticas de Bayamón a recoger unos vehículos que habían sido confiscados en dicho operativo. Al salir de la Carretera 167, se me aparea una guagua blanca, color blanca, cuatro puertas, Honda, tinteada completa, éste me lanza dicho vehículo hacia encima del vehículo que voy conduciendo, la cual tuve que esquivar. Por poco impacto un vehículo que venía de frente hacía mí por los carriles contrarios. Luego de esto, más adelante había una luz la cual estaba roja. El Agente Ríos pasó por el carril derecho. Yo me detuve detrás de la guagua. Ibamos a intervenir con el vehículo, porque pensamos que se podía relacionar con uno de los arrestados, ya que los vehículos que andábamos eran confiscados. El compañero Ríos se fue por el lado derecho de la Honda, yo me fui por el lado izquierdo, del conductor. Cuando voy llegando al lado del conductor, se baja un individuo alto, blanco, pelo negro, él está ahí, con pistola en mano, apuntando hacia el área que yo me encuentro, gritando: "Mama bicho, canto de cabrón, yo soy Policía y trabajo en el Cuartel General en depósito de armas

... Luego de esto, él rápidamente mira hacia donde se encontraba el compañero Ríos, el cual tenía un jacket' de la Policía. Al él percatarse que el Agente Ríos estaba detrás de él, guarda la pistola en su cintura, una pistola color negro, la guarda en su cintura. Le indicamos que se calmara, que nosotros éramos Policías. A todo esto se baja la esposa de él con un bebé al hombro; indicándole que se calmara, que nosotros éramos compañeros. Este me indica que le enseñara la tablilla confidencial del vehículo que yo andaba, la cual yo le indiqué que no tenía tablilla confidencial porque ese vehículo era confiscado. El nuevamente me dice que le enseñe la tablilla y le digo que se calme, que no tengo tablilla porque es un vehículo confiscado. Este vuelve y me dice: ‘Mama bicho, canto de cabrón ’ y me empuja en dos ocasiones. A todo esto, me da un puño en la boca. Luego de eso, el compañero Ríos y Salas me indicaron que nos fuéramos del lugar, ya que ese individuo estaba agresivo y podían haber otras consecuencias. Cuando nos vamos a marchar del lugar, éste mira al Agente Ríos, lo señala y le dice: "Tú, la próxima vez que te metas al medio, te voy a dar dos tiros'. Continuamos. Nos montamos en los vehículos, fuimos a hablar con el Sargento Abréu (su supervisor), le indicamos lo sucedido y éste nos dirigió hacia Bayamón Sur para hacer la querella correspondiente.” 
En el contrainterrogatorio, el ex-agente Nathaniel Guzmán Cruz declaró que recibió un hematoma en la boca. A éste se le preguntó si habían transcurrido cinco (5) días, cuándo visitó al médico para recibir atención por el alegado golpe le propinó Colón, pero respondió que no podía precisar cuántos días habían transcurrido. De otra parte, en lo pertinente, surge del contrainterrogatorio que el ex-agente Nathaniel Guzmán Cruz admitió *149 que había sido separado del Cueipo de la Policía, mientras estaba en un período probatorio, por sus hábitos y falta de confiabilidad. 
Otro de los testigos en la vista ante la C.I.P.A. fue el Sargento Jorge Luis Tirado Girona (en adelante, Tirado), quien atendió la querella que presentaron los Ex-Agentes. Tirado declaró sobre las versiones de los hechos que le ofrecieron Colón y su esposa, la Agente Wanda Ivelisse Montalvo Díaz, los Ex-Agentes en las entrevistas que realizó como parte de la investigación que llevó a cabo en el caso.
Por otro lado, Tirado señaló que el Sargento Díaz, Oficial Administrativo del Cuartel General, lo llamó para tomarle una declaración jurada sobre los hechos acaecidos entre los policías. En particular, declaró que el Sargento Díaz le solicitó que testificara que el ex-agente Nathaniel Guzmán Cruz no tenía lesión alguna en la boca. Tirado explicó que en efecto declaró lo anterior a pesar de que había corroborado que el Ex-Agente tenía un golpe en la boca, pues alegadamente se sentía hostigado.
Durante el contrainterrogatorio, a Tirado se le preguntó si los Ex-Agentes estaban vestidos de civil la noche en que ocurrió el incidente con Colón y su familia. A tal efecto, respondió que los Ex-Agentes estaban vestidos de civil, pero con un chaleco que decía Policía de Puerto Rico. No obstante, Tirado no pudo precisar si al momento en que en ocurrieron los hechos, éstos vestían dichos chalecos. De otra parte, a Tirado se le preguntó sobre el resultado de las denuncias criminales presentadas en contra de Colón. Sobre el particular, Tirado declaró que Colón resultó ser no culpable de los delitos que se le imputaron debido a la falta de credibilidad, hizo alusión al hecho de que el ex-agente Abdiel Ríos López había muerto al momento del proceso criminal y, además, que el ex-agente Nathaniel Guzmán Cruz había pasado por una situación, la cual entendemos era que éste había sido separado del Cuerpo de la Policía. 
El Capitán Luis M. Arroyo Pantojas (en adelante, Arroyo), quien era el supervisor de los ex-agentes, declaró, en lo pertinente, que el día de hechos se personó al Cuartel de Bayamón a los fines de verificar lo sucedido. Señaló que al llegar al cuartel se percató de que el ex-agente Nathaniel Guzmán Cruz tenía una laceración en el labio superior, paite inferior. Surge del contrainterrogatorio, que a Arroyo se le preguntó sobre el motivo que tuvieron los Ex-Agentes para intervenir con Colón y su familia. A esos fines, respondió que el motivo de la intervención era que Colón conducía en una forma negligente y le arrojó su vehículo en varias ocasiones sobre el vehículo que conducía uno de los Ex-Agentes. Añadió que el vehículo de Colón tenía unos tintes en los cristales bien oscuros que no permitían ver hacía el interior del mismo. Además, a Arroyo se le preguntó si los Ex-Agentes tenían un fotómetro, por lo que respondió que no.
Por otro lado, el Teniente Víctor Bernabé Díaz, anfitrión de la actividad a la que se dirigía Colón junto a su familia, declaró, en lo pertinente, que el día de los hechos se personó al Cuartel de Bayamón debido a que la Agente Wanda Ivelisse Montalvo Díaz le había llamado para informarle sobre lo sucedido y luego le volvió a llamar llorosa expresándole que “querían hacerle un 'chanchú'”. A éste se le preguntó si al llegar al cuartel notó que el ex-agente Nathaniel Guzmán Cruz estaba herido en el rostro, a lo que respondió que no tenía ningún tipo de golpe.
Por su parte, la Agente Wanda Montalvo Díaz ofreció la siguiente declaración sobre los hechos:

“El 10 de agosto a eso de las siete y media de la noche, mi esposo Fernando Colón y mis dos nenes, John Michael y Yamilet, para ese tiempo tenía uno cinco y la nena tenía ocho meses de nacida. Ibamos para una actividad en casa del Tnte. Víctor Bernabé. Cuando salimos de nuestra residencia que vamos bajando por la 167 en dirección de Comerio hacia Bayamón, mi esposo va conduciendo el auto, yo voy de pasajera y mis dos nenes. Viene un carro blanco, específicamente una guagua Daewoo y viene guiando negligentemente. Como es viernes en la noche, pues yo pensé que era algún conductor ebrio, porque suelen regularmente los viernes, verdad, y le digo a mi esposo: 'Mira, Fernán ten cuidado porque esta persona viene conduciendo a exceso de 
*150
velocidad, dando cortes, que no vaya a ser que choquemos y no podamos llegar a la fiesta'. Y él me dice: 'pues, voy a tener cuidado, pero que la persona, pues sigue dando los cortes y cambiando de carril. Y yo: 'Fernán, ten cuidado porque nos va a chocar'. Cuando vamos bajando por Matías, que está allí en la 167, hay dos carriles para bajar de Comerio hacia Bayamón. Nosotros estábamos en el carril de la derecha y el carro ya nos había pasado y estaba en el carril de la izquierda en un tapón que hay en la luz. El carro hace amague de meterse en el carril de nosotros y yo digo: “Fernán, ten cuidado, déjalo pasar porque nos va a chocar'. Fernán para y el carro no se mete. Simplemente hace el amague de meterse y no entra en el carril. Mi esposo, pues continúa la marcha. Cuando vamos más abajo, ya llegando a la luz de Taco Maker, que ya está en Bayamón Garden pasa un carro a toda velocidad por el lado del paseo de nosotros, nosotros estamos en el carril derecho, y nos intercepta frente al carro, que automáticamente mi esposo tuvo que parar. Se baja un individuo del carro y apunta con arma de fuego hacia donde nosotros estamos. Yo me descontrolé y le digo al nene, que está en el asiento de atrás, le grito: 'Acuéstate'. Yo cojo la nena, pero cuando miro a mi esposo abren la puerta del lado de mi esposo, meten la mano, le ponen la pistola en la cabeza, lo cogen por la camisa: 'Bájate cabrón, que te voy a matar.' Yo pues protejo la nena con el cuerpo porque mi esposo había sido agente encubierto y yo pensé, pues que lo iban a matar, pero que el individuo que está al lado mío abre la puerta y me manda a bajar. Cuando yo me bajo del carro, que miro al individuo lo reconozco, porque él había trabajado conmigo en el Cuartel de Cataño. Se llama... Se llamaba, porque el murió, Abdiel Ríos. Cuando él me ve, pues se asombró más de lo que yo me asombré de verlo y yo le digo: 'Ríos, ¿quépasa? Somos Policías, ¿quépasa?' Cuando me volteo a ver dónde estaba mi esposo, estaba pegado en el carro, lo tenía apuntando todavía con un arma de fuego. Cuando yo me muevo para donde él está, yo empiezo: 'Mira, por favor, somos Policías'. 'Policías, de dónde'. Y mi esposo sacó la identificación y se la muestra y le dice: 'Mira, yo soy Policía y yo trabajo en el depósito de armas. ¿Qué es lo que está pasando? ¿Por qué ustedes nos hacen esto? '¡Ah! Yo ando en ese carro confidencial y tu no nos dejaste pasar. Y mi esposo le dice: 'Pues si tú andas en un carro confidencial, ¿dónde está la tablilla amarilla de este carro? Muéstrame la tablilla amarilla donde diga que ese carro es confidencial'. Entonces, el otro sujeto que estaba al otro lado decía: 'Vámonos, vámonos, olvídate de eso, vámonos'. Y yo: 'Fernando, vámonos, resolvemos esto después'. Porque los nenes estaban gritando. Entonces los individuos se montan en los carros y se van. Y yo:' Mira, Femando, vámonos, nos vamos al Cuartel y hacemos algo.. Nos montamos en el carro y nos fuimos al Cuartel que cubría esa jurisdicción... ”. 

Además, del testimonio de la Agente Wanda Montalvo Díaz surge, en lo pertinente, que declaró que los tintes en los cristales del vehículo de su esposo eran oscuros, pero se podía ver a través de ellos. Aclaró que el ex-agente Abdiel Ríos López le ordenó a ella que se bajara del vehículo, es decir, que no se bajó espontáneamente. También testificó que Colón no le dirigió palabras soeces al ex-agente Nathaniel Guzmán Cruz ni le agredió. Añadió que Colón no sacó su arma de reglamento, pues la tenía encima, pero cuando lo bajaron, la soltó y no sabía dónde había caído en el carro.
El Policía Fermín González Valentín (en adelante, González), retén del Cuartel de Bayamón, declaró, en lo pertinente, que Colón y su esposa llegaron primero y minutos después llegaron los Ex-Agentes, que estaban vestidos en ropa de civil, acompañados por sus supervisores. También declaró que el ex-agente Nathaniel Guzmán Cruz no tenía ninguna lesión en la cara.
El último en declarar durante la vista administrativa fue Colón; éste corroboró la versión de su esposa, la Agente Wanda Montalvo Díaz. Por otro lado, en lo pertinente, testificó que los Ex-Agentes estaban vestidos de civil y que no se identificaron como policías al momento de intervenir con él. También declaró que mientras esperaban en el cuartel para presentar la querella, los Ex-Agentes se reunieron con el Sargento Raúl Abréu, el Capitán Luis M. Arroyo y el Agente Roberto Reyes Mendoza por espacio de una hora a dos horas. Colón declaró que luego de la reunión, salió el Sargento Tirado y le pidió su arma de fuego sin haberle entrevistado sobre los hechos. Señaló que le dieron un boleto por los tintes en los cristales de su vehículo, pues el Fiscal había ordenado que se expidiera dicho boleto porque ese había sido el motivo por el cual los Ex-Agentes habían intervenido con él y su familia. Añadió que en ningún momento se verificó el por ciento de trasmisión *151 de luz de los tintes en los cristales de su vehículo.
A base de la prueba desfilada y los testimonios, el 5 de agosto de 2003, notificada el 19 de septiembre de 2003, la C.I.P.A. emitió Resolución en la que confirmó la decisión de expulsar a Colón de la Policía de Puerto Rico.
Así las cosas, el 8 de octubre de 2003, Colón presentó Moción de Reconsideración y Solicitud de Producción de Acta.
El 14 de octubre de 2003, notificada el 7 de noviembre de 2003, la C.I.P.A. emitió Resolución en la que declaró “no ha lugar” la solicitud de reconsideración presentada por Colón.
El 8 de diciembre de 2003, inconforme con el dictamen de la C.I.P.A., Colón recurre ante este Tribunal mediante el recurso que nos ocupa y señala la comisión de los siguientes errores:

“1. Erró la Honorable Comisión de Investigación, Procesamiento y Apelación al descartar injustificada y arbitrariamente la prueba de descargo, así como la prueba documental que sostenía el error ante ésta, e igualmente en la apreciación de la totalidad de la prueba ante sí presentada que sostenía las alegaciones del aquí recurrente.

2. Erró la Honorable Comisión de Investigación, Procesamiento y Apelación al aplicar sanciones al apelante-recurrente conforme a un reglamento de personal inexistente conforme a derecho, y en violación al mandato expreso de la Ley Orgánica de la Policía de Puerto Rico, Ley Núm. 53 de 10 de junio de 1996. ”

Atendido el recurso, concedimos término a la Policía para presentar su alegato. Con el beneficio de su comparecencia, resolvemos.
II
Antes de discutir los errores señalados por Colón, es necesario atender el siguiente asunto. En su alegato, la Policía señaló que Colón incluyó como parte del apéndice una serie de documentos que no estuvieron ante la consideración de la C.I.P.A., por lo que se deben excluir del expediente. A tales efectos, nos solicitó que elimináramos del apéndice unos recortes de periódicos relacionados con los ex-agentes Nathaniel Guzmán Cruz y Abdiel Ríos López. Examinado el expediente, notamos que ciertamente se incluyeron tres (3) recortes de tres rotativos del país con fecha de 14 de noviembre de 2001, los cuales señalan que el ex-agente Nathaniel Guzmán Cruz había sido separado de su cargo por haber mentido en la entrevista de reclutamiento, pues ocultó que había sido denunciado por un incidente de violencia doméstica y que había agredido verbalmente y físicamente a dos (2) policías municipales en unos hechos ocurridos en noviembre de 1999. De otra parte, Colón incluyó en el apéndice un recorte de periódico con fecha de 15 de marzo de 2002, en el que se señalaba que el ex-agente Abdiel Ríos López se había privado de la vida. De la transcripción de la vista administrativa celebrada por la C.I.P.A., surge que en varias ocasiones se trajo a la atención de dicho foro el hecho de que el ex-agente Nathaniel Guzmán Cruz había sido separado de su puesto en la Policía, inclusive éste lo aceptó en el contrainterrogatorio. De igual forma, se mencionó la muerte del ex-agente Abdiel Ríos López y se admitió su declaración en evidencia durante la vista celebrada. No obstante, los recortes de periódicos antes mencionados no se admitieron en evidencia. A tenor con lo anterior, se excluye del apéndice dicha evidencia, pues la misma no estuvo ante la consideración de la C.I.P.A.
Por otro lado, la Policía señaló que se incluyó como paite del apéndice la investigación administrativa realizada por el Sargento Víctor Díaz Cabrera de la Superintendencia Auxiliar en Investigaciones Administrativas y Asuntos Disciplinarios de la Policía de Puerto Rico, la cual incluía los siguientes documentos: las declaraciones juradas del retén Fermín González Valentín; Teniente Víctor Bernabé; Agente *152 Orlando Pérez Ramos, quien no declaró ante la C.I.P.A.; ex-agente Femando Colón Trinidad; Agente Wanda Montalvo; Sargento Jorge Tirado Girona; Agente Luis Ángel Salas, quien no declaró ante la C.I.P.A.; Javier Pérez Rosa, quien no declaró ante la C.I.P.A. y entrevista al Dr. Ferrán de 2 de enero de 2002, quien atendió al ex-agente Nathaniel Guzmán Cruz que tampoco declaró ante la C.I.P.A.; y la declaración jurada de 23 de abril de 2002 del Sargento Víctor Díaz Cabrera ante la Oficina de Integridad Pública sobre la investigación que realizó sobre los hechos, éste no declaró ante la C.I.P.A. De acuerdo a la transcripción de la vista administrativa surge que dichas declaraciones juradas no se admitieron en evidencia.
La Regla 59 del Reglamento del Tribunal de Apelaciones en su inciso (E) (3) dispone que el apéndice del recurso sólo contendrá copias de documentos que formen parte del expediente original ante el foro administrativo. Sabido es que el apéndice consiste en la recopilación literal de los documentos pertinentes acumulados durante el trámite administrativo, esto es, sustituye el expediente administrativo por razón de que en revisión sólo se puede considerar lo que tuvo ante sí dicho foro al resolver. Véase, 3 L.P.R.A. see. 2168. Es doctrina reiterada que las partes deben cumplir con las disposiciones reglamentarias establecidas para la presentación y forma de los recursos y que su incumplimiento puede dar lugar a la desestimación. Arriaga Rivera v. Fondo del Seguro del Estado, 145 D.P.R. 122, 129-130 (1998).
A tenor con lo anterior, Colón no podía incluir los documentos antes mencionados en el apéndice del recurso de revisión para argumentar cuestiones no planteadas ante la agencia administrativa; por ello, no podemos considerar los mismos. Se le advierte a las partes que en lo sucesivo, al presentar sus escritos ante los tribunales, deben cumplir fielmente con las disposiciones reglamentarias aplicables.
III
Como primer error, Colón planteó que incidió la C.I.P.A. al descartar injustificadamente y arbitrariamente la prueba de descargo, así como la prueba documental que sostenía el error ante ésta, e igualmente en la apreciación de la totalidad de la prueba ante sí presentada que sostenía sus alegaciones.
Como es sabido, los tribunales apelativos deben ser cautelosos al intervenir con las determinaciones administrativas de los foros especializados porque las conclusiones y determinaciones de los organismos administrativos merecen gran consideración y respeto por los tribunales en la etapa de revisión judicial. Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, 122-123 (2000); Associates Insurance Agencies Inc. v. Comisionado de Seguros, 144 D.P.R. 425, 436 (1997); Misión Industrial v. Junta de Planificación, 145 D.P.R. 908, 929-930 (1998). No obstante, la deferencia judicial en la revisión de las determinaciones administrativas no conlleva la renuncia de los tribunales a su función revisora. Tan sólo implica que dicha función es de carácter limitado. Sólo la ejerceremos en los casos apropiados. Tal intervención sólo estará justificada cuando la agencia obre de manera arbitraria o ilegal, o en forma tan irrazonable que abusó de su discreción. Municipio de San Juan v. Junta de Calidad Ambiental, 149 D.P.R. 263, 280 (1999); T-JAC, Inc. v. Caguas Centrum Limited Partnership, S.E., 148 D.P.R. 70, 80-81 (1999); Comité de Vecinos Pro-Mejoramiento Inc. v. Junta de Planificación, 147 D. P.R. 750, 761 (1998); Fuertes y otros v. A.R.P.E., 134 D.P.R. 947, 953 (1993).
En el caso ante nuestra consideración, Colón plantea un asunto de credibilidad dirigido a cuestionar las determinaciones de hechos que hiciera el foro administrativo en cuanto a lo que efectivamente aconteció el día del incidente. En su escrito, Colón expuso, en síntesis, que de un análisis del récord se demuestra que las determinaciones que hizo la C.I.P.A. no representan el balance más racional, justiciei'o y jurídico de la totalidad de la evidencia presentada ante dicho foro. Añadió que en el récord existía prueba fehaciente al efecto de menoscabar el peso de la evidencia que tomó en consideración la C.I.P.A. En apoyo de su posición, argumentó que la C.I.P.A. erró al darle credibilidad exclusivamente al testimonio del ex-agente Nathaniel Guzmán Cruz y al contenido de la declaración jurada del ex-agente Abdiel Ríos López. A tenor con lo anterior, Colón expuso ciertas inconsistencias que resaltan en cuanto a los hechos del caso conforme a la versión que ofreció el ex-agente Nathaniel Guzmán Cruz ante la C.I.P.A. Entre otras cosas, Colón planteó que si en efecto el ex-agente *153 Nathaniel Guzmán Cruz fue empujado y agredido en el labio, debió arrestarlo inmediatamente. Por otro lado, señaló que de ser cierto los hechos alegados, resultaba ilógico que él hubiera sido el primero en acudir al cuartel para presentar una querella contra los ex-agentes. Inclusive, señaló que los ex-agentes llegaron al cuartel con posterioridad; no obstante, fueron los primeros en ser entrevistados y a raíz de la versión que éstos ofrecieron se expidió el boleto por los tintes en los cristales de su vehículo y se presentaron las denuncias por tres (3) delitos del Código Penal en su contra.
Por otro lado, de acuerdo a las conclusiones de la C.I.P.A., la Policía no erró al adjudicarle credibilidad a los ex-agentes, respecto a la agresividad observada por Colón en el lugar de los hechos. Señaló que el Sargento Tirado corroboró que el ex-agente Nathaniel Guzmán Cruz había sido golpeado en el rostro, pues observó que presentaba signos visibles de haber sufrido una agresión. Argumentó la C.I.P.A. que ello explicaba el porqué las versiones de los ex-agentes les mereció mayor crédito. Por otro lado, sostuvo que el Agente Fermín González quien había declarado que el ex-agente Nathaniel Guzmán Cruz no presentaba lesiones en el rostro, resultó ser un ex compañero de la Agente Wanda Montalvo por lo que su testimonio no le mereció crédito.
Es norma reiterada que, al apreciar la prueba ante su consideración, los tribunales apelativos no habrán de pasar juicio sobre la credibilidad de los testimonios ofrecidos ante el foro de instancia, o ante el foro administrativo. Por lo que no intervendremos con la adjudicación de credibilidad que haya hecho el juzgador de los hechos, excepto en casos en que éste haya incurrido en prejuicio, parcialidad, pasión o error manifiesto. Argüello López v. Argüello García, 155 D.P.R. _, 2001 J.T.S. 127, a la página 94, Opinión de 31 de agosto de 2001; Trinidad García v. Chade, 153 D.P.R. _, 2001 J.T.S. 10, a la página 793, Opinión de 18 de enero de 2001. Ello es así, porque es ante el foro de instancia que declararon los testigos y quien tiene la oportunidad de apreciar el comportamiento, evaluar la veracidad del testimonio y dirimir cualquier conflicto que surgiera en el proceso. Pueblo v. Dávila Delgado, 143 D.P.R. 157, 173 (1997). Ahora bien, la deferencia a los foros administrativos no significa que las determinaciones administrativas estén inmunes de revisión judicial. Fuertes y Otros v. A.R.P.E., supra, a la página 953. En el caso de las agencias administrativas que ejercen función adjudicativa, “el arbitrio del juzgador de los hechos es respetable, mas no absoluto ”, y “una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal.” Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987).
No empece a lo anterior, de entrada señalamos que las determinaciones de la C.I.P.A nos producen insatisfacción de conciencia y estremecen nuestro sentido de justicia, por lo que entendemos que debemos intervenir con ellas. Véase, Flores v. Soc. de Gananciales, 146 D.P.R. 45, 49 (1998).
Como señaláramos, el caso de autos tiene su génesis en un altercado entre policías, los cuales culminaron en unos hechos violentos, y los cuales a su vez dan lugar a la expulsión de Colón de la Policía. De un examen detallado de la transcripción de autos, se desprende, sin duda, la existencia de prueba conflictiva en torno a la forma y manera en que ocurrieron los hechos, así como la persona que comenzó la agresión verbal y si en efecto hubo alguna agresión física contra el ex-agente Nathaniel Guzmán Cruz en el incidente de marras.
De otra parte, el ex-agente Nathaniel Guzmán Cruz declaró que cuando intervinieron con Colón, éste se bajó con su arma de reglamento en mano, apuntándole y profiriéndole palabras soeces. Además, declaró que al Colón percatarse que el Agente Ríos estaba detrás de él, guardó el arma en su cintura y luego de otro intercambio de palabras, le empujó en dos (2) ocasiones y le dio un puño en la boca. Por otro lado, el Sargento Jorge Tirado Girona y el Capitán Luis Arroyo Pantojas declararon que en efecto el ex-agente presentaba una lesión en la boca.
Mientras que de los testimonios de Colón y la Agente Wanda Montalvo Díaz, surge que el ex-agente Nathaniel Guzmán Cruz abrió la puerta y apuntándole con su arma de reglamento bajó a Colón del vehículo y le *154 dijo “Bájate cabrón, que te voy a matar”. Además, surge que luego del intercambio de palabras los ex-agentes abandonaron el lugar, sin que Colón les dirigiera ninguna palabra grosera ni les agrediera. De otra parte, el Teniente Víctor Bernabé y el retén Fermín González declararon que el ex-agente Nathaniel Guzmán Cruz no presentaba ninguna lesión en la boca. Sobre este hecho en particular; resalta que el ex-agente Nathaniel Guzmán Cruz no visitó inmediatamente un hospital o un médico para recibir atención médica. Entendemos que de haber sido agredido por Colón quien resultó ser un hombre alto y que en ese momento pesaba unas doscientos cincuenta y cinco (255) libras, era de esperarse que presentara hematomas, hinchazón o alguna cortadura. Inclusive, el ex-agente Nathaniel Guzmán Cruz sólo mencionó que había visitado al Dr. Ferrán, quien le dio un certificado; no obstante, no abundó en cuanto a si había recibido algún tratamiento por la alegada lesión.
No podemos pasar por alto que en el presente caso, durante la vista ante la C.I.P.A., el ex-agente Nathaniel Guzmán Cruz fue abordado sobre el hecho de que había sido destituido de la Policía mientras estaba en un período probatorio, por sus hábitos y falta de confiabilidad, hecho que éste aceptó.
Otro asunto que trae nuestra atención en el presente caso, es el hecho de que un tercer miembro de la Policía fue testigo de lo sucedido cuando se intervino con Colón. Ese agente, de nombre Luis A. Salas Morales, estaba conduciendo un vehículo confiscado marca Nissan, modelo Sentra, del año 1992. Sin embargo, de la transcripción surge que éste prestó una declaración jurada durante la investigación administrativa que condujo la Policía, pero inexplicablemente no testificó en la vista celebrada el 7 de mayo de 2003, a pesar de haber sido citado, pues alegadamente se encontraba en Vieques. 
Por otro lado, aunque la norma es que una absolución o archivo de una denuncia en un proceso criminal no impide que se destituya un funcionario o empleado público en un proceso administrativo basado en los mismos hechos que motivaron la acción criminal, San Vicente v. Policía de Puerto Rico, 142 D.P.R. 1, 5-6 (1996); Mundo v. Tribunal Superior, 101 D.P.R. 302, 304-305 (1973), en el presente caso, sobresale que durante la vista el Sargento Tirado declaró que Colón resultó ser no culpable de los delitos que se le imputaron debido a la falta de credibilidad de la prueba de cargo.
En virtud de lo anterior, concluimos que se cometió el error alegado.
IV
En el segundo error, Colón señaló que erró la C.I.P.A. al aplicar sanciones a Colón conforme a un reglamento de personal inexistente conforme a derecho y en violación al mandato expreso de la Ley Orgánica de la Policía de Puerto Rico, Ley Núm. 53 de 10 de junio de 1996.
La aludida Ley Núm. 53 de 10 de junio de 1996, 25 L.P.R.A. see. 3101 et seq., determina entre sus disposiciones transitorias, 25 L.P.R.A. see. 3137, que hasta tanto empiece a regir el nuevo Reglamento que establece esta ley, la Policía se regirá por el anterior Reglamento establecido en la derogada Ley Núm. 26 de 22 de agosto de 1974, 25 L.P.R.A. sec. 1001 et seq. Es decir, el Reglamento de Personal de la Policía de Puerto Rico presentado ante el Departamento de Estado el 11 de mayo de 1990 (en adelante Reglamento del 1990), será aplicable excepto en cuanto a aquellas disposiciones que fueren incompatibles con la nueva Ley Núm. 53, supra. No obstante, la Ley Núm. 53, supra, dispuso que el Superintendente vendría obligado a redactar un nuevo Reglamento de la Policía dentro del término de noventa (90) días a partir de la aprobación de la ley. Siendo esto así, no habiéndose aprobado el nuevo reglamento, la acción disciplinaria que nos ocupa se rige por el Reglamento del 1990. Además, es menester señalar que la legislatura aprobó la Ley Núm. 133 de 22 de septiembre de 2001 para restituir, retroactivamente al 1 de junio de 2001, la validez de todo reglamento de las agencias de la Rama Ejecutiva que hayan quedado derogadas por efecto del Artículo 2 de la Ley Núm. 205 de 25 de agosto de 2000.
Cónsono con las disposiciones de la ley antes citada, debemos concluir que el error imputado no fue *155 cometido. La Ley Núm. 53, supra, dispone que hasta tanto empiece a regir el nuevo Reglamento, el Personal de la Policía de Puerto Rico se regirá por el Reglamento del 1990 en cuanto a aquellas disposiciones que no sean incompatibles con la nueva ley. No existe incompatibilidad entre la Ley Núm. 53, supra, y el Reglamento de 1990, por lo que el mismo es válido en lo que respecta a medidas disciplinarias. De acuerdo a lo anterior, es forzoso concluir que el error planteado no fue cometido.
y
Por los fundamentos expuestos, se revoca el dictamen de la C.I.P.A y se ordena la reinstalación de Colón a su puesto abonándosele los haberes dejados de percibir de conformidad con lo resuelto por el Tribunal Supremo de Puerto Rico en el caso de Hernández Badillo y Otros v. Municipio de Aguadillo, 154 D.P.R. _, 2001 J.T.S. 82, Opinión de 6 de junio de 2001. Conforme a dicha norma, procede en este caso que la Policía, como patrono, celebre una vista en la que se determine si Colón recibió algún ingreso por trabajos realizados en la empresa privada o el gobierno durante el período en que estuvo destituido a los fines de que dichos ingresos se deduzcan de los salarios a ser concedidos.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Laura M. Yélez Vélez
Secretaria del Tribunal de Apelaciones