# 2008 DTA 91

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL IV**

JAMITH TORRES RAMOS
Recurrida

v.

ADMINISTRACIÓN DE REHABILITACIÓN VOCACIONAL
Recurrente

Núm. KLRA-08-00479

San Juan, Puerto Rico, a 11 de julio de 2008

Panel integrado por su Presidente, el Juez López Feliciano,
la Juez Pabón Charneco y el Juez Hernández Serrano

Jueza Pabón Charneco, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos, mediante recurso de revisión judicial, la Administración de Rehabilitación Vocacional, en adelante, ARV, representada por el Procurador General, solicitando la revisión de una Resolución emitida por la Oficina del Procurador de las Personas con Impedimentos, en adelante, OPPI. Mediante dicho dictamen, la OPPI, *inter alia*, le ordenó a la ARV reembolsar los costos de estudios en la Universidad Autónoma de Guadalajara en Méjico, para los años académicos 2005-2006 y 2006-2007, a Jamith Torres Ramos, en adelante, Torres.

Por los fundamentos que se esbozan a continuación, se revoca la Resolución recurrida.

### I
Conforme surge del recurso ante nuestra consideración, el 21 de julio de 2005, Torres presentó una Petición contra la ARV. Mediante la misma, Torres solicitó a la agencia costeara sus estudios de medicina en la Universidad Autónoma de Guadalajara, Méjico, así como otros gastos relacionados. Apuntó que el petitorio se realizaba conforme lo estipulado en su Plan Individualizado para Empleo, en adelante, PIE o PIRE. Celebrados los trámites procesales correspondientes, la OPPI emitió su dictamen el 21 de diciembre de 2007, notificado en igual fecha. El Procurador de OPPI emitió las siguientes determinaciones de hechos las cuales transcribimos *in extenso*.

*"1. Jamith Torres Ramos es beneficiaria y participante de la ARV desde el año 2000.*

*2. Jamith Torres Ramos es una persona con impedimento que presenta la condición de lesión lumbar hace ocho (8) años. Condición que le provoca fuertes dolores, limitaciones al caminar y no le permite mover objetos pesados.*

*3. La querellante (Torres) estudió Tecnología Radiológica en la Universidad Interamericana de Puerto Rico, de donde se graduó el 17 de septiembre de 2001.*

*4. El PIRE (PIE) expresaba como meta de empleo Tecnóloga Médica. Esto fue enmendado el 12 de julio de 2000 estableciéndose como meta Tecnóloga Radiológica. La enmienda se debió a que la meta inicial se había descrito por error como Tecnóloga Médica cuando debía haber aparecido en el documento Tecnóloga Radiológica.*

*5. Posteriormente, en el PIRE (PIE) del 3 de agosto de 2001, el Sr. Manuel Rivera (Consejero de Jamith Torres) realizó una enmienda aprobando los estudios en Medicina General.*

*6. Los prerrequisitos en Medicina General exigen el cumplir con noventa (90) créditos en ciertos cursos para poder estudiar dicha disciplina.*

*7. En el PIRE (PIE) ante mencionado se desprende que la ARV auspició los estudios, manutención y hospedaje del bachillerato en Ciencias Naturales (entiéndase, la Pre-Médica) de la querellante (Torres), en la Universidad de Puerto Rico Recinto de Río Piedras.*

*8. La Consejera Nancy Paneto Camacho y la querellante (Torres) suscribieron un PIE el 10 de agosto de 2004 en el cual se establece nuevamente que la meta de empleo es Medicina General.*

*9. La fecha proyectada para alcanzar la meta de empleo es el 31 de diciembre del 2004, término que concuerda con el tiempo esperado para terminar los estudios en Pre-Médica.*

*10. El 4 de marzo de 2004 se citó a la querellante (Torres) para evaluar los estudios económicos que requería el continuar con su meta de empleo en Medicina General.*

*11. La querellante (Torres) tomó el examen de admisión a la Escuela de Medicina, conocido como Medical College Admisión (sic) Test (en adelante MCAT) con el propósito de ingresar en alguna de las escuelas de medicina establecidas en Puerto Rico.*

*12. La querellante (Torres) tomó el examen del MCAT en tres ocasiones con la intención de obtener un valor mayor de diecinueve (19); puntuación requerida para lograr ingresar en alguna de las escuelas de medicina de Puerto Rico.*

*13. El 10 de agosto de 2004 a través del documento PIE se enmienda la meta de empleo de "Tecnóloga Radiológica" a "Medicina General", pues por error de ARV continuaba apareciendo en el PIRE (PIE) del 21 de octubre del 2003 "Tecnóloga Radiológica". En ese momento, la querellante (Torres) estaba cursando su Pre-Médica auspiciada por la ARV.*

*14. En el PIE del 30 de junio de 2005 se estableció vía documento suscrito por la Consejera Nancy Paneto Camacho y la querellante (Torres) lo servicios que ARV le ofrecería a la querellante (Torres) en su meta de "Medicina General" previo al cumplimiento de todos los requisitos que exige dicha disciplina, como el MCAT y los cursos de Pre-Médica.*

*15. El testimonio de la Sra. Paneto Camacho, Consejera de la querellante (Torres), estableció, indubitadamente, que entre ambas fue que se determinó la meta de empleo y, por lo tanto, el PIRE (PIE) en aquel entonces puede ser enmendado conforme a la evolución de los intereses y aprovechamiento del participante.*

*16. El 1ro de agosto de 2005, la Sra. Paneto Camacho, Consejera de la ARV, Región Sur, notificó por carta a la Sra. María Benítez, supervisora de Oficina de Servicios de Consejería en Rehabilitación Vocacional (en adelante*

*OSCRV) a Nivel Central, que el Equipo de Supervisión Técnica de Rehabilitación (en adelante ESTER) de la Región Sur-Ponce recomendó positivamente el auspicio de los estudios en medicina de la querellante (Torres).*

*17. El 8 de agosto de 2005, Jamith Torres Ramos fue admitida a la Universidad Autónoma de Guadalajara para cursar la carrera de Medicina.*

*18. La Sra. Paneto Camacho estableció con su testimonio que la meta final de la querellante (Torres) es ser Doctora en Medicina y que el caso fue consultado a ESTER Región Sur, donde el servicio fue recomendado positivamente.*

*19. El 23 de septiembre de 2005, la Sra. Paneto Camacho comunica mediante escrito que la ARV decide no auspiciarle el servicio."*

Véase, Anejo III del Apéndice.

En sus conclusiones de derecho, apuntó la OPPI:

*"Jamith (Torres) tendrá que cumplir con su meta u objetivo vocacional para luego poder obtener un empleo conforme con la preparación académica que fue costeada por la Agencia. La consumidora debe participar de un proceso preliminar establecido por la Agencia para que pueda obtener los servicios de rehabilitación en el empleo a través de ARV. Este proceso incluye, aunque no se limita, a: entrevistarse con un Consejero designado para determinar la elegibilidad del candidato que va a recibir servicios. Una vez se determina la elegibilidad de la persona, el Consejero preparará con éste su programa de trabajo, conocido como Plan Individualizado Escrito de Rehabilitación, (PIER por sus siglas), para aquel entonces. Dicho **documento debe ser revisado con la participación de ambas partes**, es decir **consumidor y Agencia, a través de su consejero**, por lo menos una vez al año, de forma tal que las mismas estén orientadas de una manera responsable y adecuada con respecto al desarrollo y eventualidades de las obligaciones contraídas en el PIER (PIE). **La anuencia, o aceptación, del contenido del PIER se produce con la firma del mismo por la consumidora, el consejero y el Supervisor de la Agencia.***

*La parte querellada (ARV) no logró establecer mediante prueba que la Srta. Jamith Torres Ramos había satisfecho su meta vocacional, de Doctora en Medicina. La carrera de medicina requiere un Post-Grado académico razón por la cual la querellante (Torres) se encontraba realizando sus estudios en Pre-Médica tal y como se evidenció con el documento PIRE (PIE) de agosto de 2001. Este documento demostraba claramente la elegibilidad de la querellante (Torres) para recibir los servicios de ARV y cumplía con las normas de la "Guía Revisada para el Servicio de Adiestramiento a Nivel Graduado bajo los auspicios de la Administración de Rehabilitación Vocacional".*

Las Guías de referencia claramente establecen que la ARV auspiciará servicios de adiestramiento a Nivel Graduado, sujeto a las siguientes disposiciones:

*"La persona con impedimentos tiene que haber sido certificado (sic) elegible para servicios de rehabilitación vocacional, quien junto a su consejero de rehabilitación vocacional y como parte del proceso de una avaluación (sic) abarcadora, acuerdan una meta de empleo profesional, como resultado de una selección informada, cuyo nivel de ingreso requiere un grado académico a nivel Graduado.*

*De acuerdo a la disposición anterior podemos concluir que surge del caso de autos que la querellante (Torres) cumplió con cada uno de los requisitos previos según exigió la ARV para ser elegible para los servicios a nivel Graduado en el extranjero.*

*En evidencia documental y testifical sometida ante nuestra consideración queda demostrado que se realizó una avaluación (sic) abarcadora, pues todo el expediente fue enviado ante la consideración del ESTER y los documentos contenían las firmas requeridas; del Consejero de Rehabilitación Vocacional y de la querellante (Torres).*

*En el Code of Federal Regulations ...se establece de manera clara y precisa que la información que contiene el PIRE (PIE) es esencial...*

*La parte querellada (ARV) alegó que al cumplirse con la meta de empleo pactada al comienzo de la relación entre el auspiciador (entiéndase ARV) con el consumidor, la responsabilidad del auspiciador para con la querellante (Torres) cesaba, ya que se había logrado la meta de empleo.*

*Contrario a lo alegado por la ARV, se desprende de la evidencia contenida en el expediente que desde el 3 de agosto de 2001, el Sr. Manuel Rivera, Consejero de la querellante (Torres), enmendó el PIRE (PIE) a solicitud de ésta sustituyéndose la meta de empleo a Medicina General, de acuerdo a los intereses de la querellante (Torres) y obedeciendo las recomendaciones del ESTER.*

*Es evidente que ARV tenía conocimiento de que la meta vocacional de la Srta. Tores Ramos era Medicina General, por lo que había aprobado el auspicio de los estudios, manutención y hospedaje del bachillerato en Ciencias Naturales (entiéndase la Pre-Médica), de la querellante (Torres). Dicho bachillerato por sí sólo, no tiene "salida" o empleabilidad. Sólo es un pre-requisito para la carrera de Medicina.*

*Los consejeros de la querellante (Torres) siempre estuvieron informados sobre la meta u objetivo vocacional de la consumidora, la cual siempre se mantuvo a la ARV informada de cuáles eran sus intereses. La ARV avaló lo establecido en los PIRE (PIE) desde el momento que autorizó el auspicio de los estudios, manutención y gastos de sus años de Pre-Médica. Este documento constituye contrato entre las partes que lo suscriben...*

*El PIRE (PIE) es un acuerdo escrito otorgado entre las partes, obliga a éstas a cumplir con lo pactado de manera recíproca. La querellante (Torres) cumplió su parte con su obligación de mantener un índice académico mínimo requerido por la ARV. La querellada (ARV) otorgó un PIRE (PIE) válido donde se comprometía a proveer ayuda económica a la querellante (Torres) para costear su carrera profesional en Medicina. Pero sin razón justificada en derecho, dejó de proveer el auspicio económico con el que se había comprometido. Queda claramente establecido que la querellante (Torres) tiene que tomar y terminar su Pre-Médica para lograr algún día completar su meta vocacional. Con el acto de auspiciar la Pre-Médica, ARV demuestra estar de acuerdo en que el proceso de estudio no ha terminado y que, por lo tanto, es imposible el que se haya completado la meta vocacional pactada. Sus actos van en contra de lo alegado ante este Foro. Procede entonces que se dicte Resolución dictando el reembolso de los gastos incurridos, y el auspicio continuado de la ARV, siempre y cuando la querellante (Torres) cumpla con los requisitos mínimos que exige la ARV."* (Énfasis en el original.)

*Id.*

Inconforme, la ARV presentó escrito intitulado *"Moción de Reconsideración"*. En el escrito adujo, entre otros extremos, que los PIE o PIRES estableciendo como meta ocupacional eran nulos y que Torres no había cumplido con un sinnúmero de requisitos que disponía la Guía Revisada para el Servicio de Adiestramiento fuera de Puerto Rico.

La OPPI ordenó a Torres que presentara su oposición.

El 3 de abril de 2008, notificada en igual fecha, la OPPI denegó el petitorio de la ARV.

Inconforme, la ARV, representada por el Procurador General, acude ante nos. Contando con el alegato de Torres, procedemos a resolver.

## II

En su escrito, la ARV plantea que incidió la OPPI al ordenarle reembolsar los gastos incurridos por Torres para sus estudios en Guadalajara, a pesar de que ésta no cualifica para dicho beneficio y que los errores administrativos no crean derechos.

## III

La Ley de Rehabilitación de 1973 (*Rehabilitation Act of 1973*, 29 U.S.C.A. sec. 701 *et seq*.) autoriza la concesión de fondos federales para asistir a los estados, incluyendo a Puerto Rico, a proveer servicios de rehabilitación vocacional a personas con impedimentos. 29 U.S.C.A. sec. 720(b). La participación estatal en estos programas es voluntaria, y aquellos estados que deciden recibir dichos fondos deben comprometerse a cumplir las obligaciones establecidas en el estatuto y sus reglamentos. 29 U.S.C.A. sec. 721.

Los servicios de rehabilitación vocacional que los estados deben facilitar al amparo de dicha ley son aquellos servicios necesarios para asistir a un individuo con impedimentos "*a prepararse, asegurar, retener, o recobrar un empleo que sea consistente con sus fuerzas, recursos, prioridades, preocupaciones, habilidades, capacidades, intereses, y con la decisión informada del individuo*". 29 U.S.C.A. sec. 721. **[1]**

Una persona es elegible para recibir los servicios bajo estos programas si, conforme a la ley, la persona: "*(A) is an individual with a disability...; and (B) requires vocational rehabilitation services to prepare for, secure, retain, or regain employment*". 29 U.S.C.A. sec. 722(a)(1).

Para recibir los beneficios de dichos servicios, el individuo debe, junto con un consejero, preparar un Plan Individualizado de Rehabilitación para Empleo (PIRE). El PIRE debe ser revisado anualmente y en el mismo el beneficiario y su Consejero Vocacional deben ponerse de acuerdo para establecer las metas vocacionales. 29 U.S. C.A. sec. 722(b)(2), 722 (b)(2) (E)(i).

En Puerto Rico, la ARV es la "*unidad estatal designada*", conforme a la Ley de Rehabilitación de 1973, que tiene la obligación de determinar el uso y desembolso de fondos federales destinados a servicios de rehabilitación vocacional. 18 L.P.R.A. sec. 1066, 1070; 29 U.S.C.A. sec 721.

La Ley Núm. 97 de 10 de junio de 2000 trasladó la ARV del Departamento de la Familia al Departamento del Trabajo y Recursos Humanos. Según el Artículo 2 de dicho estatuto, es política pública del Gobierno de Puerto Rico que la ARV fomente la selección y transferencia de poderes, según este término está definido en la Ley de Rehabilitación de 1973, a las personas con impedimentos físicos o mentales, mediante la prestación de servicios de rehabilitación vocacional consistentes con sus fortalezas, recursos, prioridades, intereses, habilidades y capacidades para ayudarlos a lograr un empleo remunerado, mejorar su calidad de vida, autosuficiencia y autoestima, con el propósito de integrarlos a la comunidad conforme a los parámetros de la ley.

Cónsono con lo anterior, la ARV tiene la obligación de desarrollar sus programas y de proveer servicios "*en armonía con las disposiciones de las leyes federales [i.e., la Ley Federal de Rehabilitación de 1973, supra], y la reglamentación aplicable, armonizando y ajustando sus programas y servicios a tenor con esta política pública*". Art. 2 de la Ley Núm. 97, *supra*, 18 L.P.R.A. sec. 1064 (anotaciones) y sec. 1064(d). Lo anterior significa que la ARV tiene la obligación de garantizar que los recursos federales y estatales asignados para la prestación de servicios de rehabilitación vocacional para personas con impedimentos, se utilicen en la forma más efectiva y de acuerdo con las leyes y reglamentos aplicables. 18 L.P.R.A. sec. 1066(1).

Por otro lado, la Ley Núm. 2 de 27 de septiembre de 1985, según enmendada, conocida como *"Ley de la*

*Oficina del Procurador de las·Personas con Impedimentos"*, 3 L.P.R.A. sec. 532 *et seq.*, creó la OPPI, y le brindó a esa oficina la facultad de poner en vigor las disposiciones de, entre otras, la Ley de Rehabilitación de 1973, 3 L. P.R.A. sec. 532 y secs. 532(f)(a), 532(g)(b).

Referente al problema de delimitar el nivel y extensión de ·beneficios a los cuales una persona tiene derecho bajo la Ley de Rehabilitación de 1973, los Tribunales de varias jurisdicciones ·en los Estados Unidos han emitido decisiones persuasivas. [2]

En la interpretación de este concepto, a·la luz de los· objetivos de la Ley de Rehabilitación de 1973, algunos tribunales han delineado el alcance de las obligaciones y responsabilidades de las instituciones estatales encargadas de brindar los servicios de rehabilitación vocacional que la ley federal exige. Principalmente, la adjudicación· de este asunto ha gravitado alrededor de determinar en qué consiste la obligación de los estados participantes según establecida en la Sec. 701 de la Ley de ·Rehabilitación del ·1973, *supra*. En específico, dicha sección dispone que el propósito de la ley es *"to empower individuals with disabilities to maximize· employment, economic self-sufficiency, independence, and inclusion and integration into society"*. 29 U.S.C.A. ·sec. 701(b)(1) Así, pues, ha sido en gran medida tarea de los tribunales el determinar exactamente el ·significado de lo que es ·la obligación de los estados de *"maximize employment"*. En *Buchanan v. Ives, supra*, el Tribunal· de Distrito de los Estados Unidos para el Distrito de Maine resolvió que, al analizar los parámetros de la obligación de la agencia estatal, debe prevalecer el significado común· de la palabra *"maximizar"*, que es aumentar hasta su máxima extensión (*"to increase to the utmost extent"*). En dicho caso, el tribunal consideró la denegatoria de una agencia estatal de proveer servicios a una persona con impedimentos que deseaba desempeñarse· como fotógrafo profesional independiente. El tribunal revocó la determinación de la agencia y ordenó que se proveyeran los servicios requeridos. Al así actuar, interpretó literalmente que la obligación estatal de *"maximize... employability"* implica la obligación estatal de proveer beneficios para en efecto lograr que las personas· con impedimentos alcancen sus metas en el nivel más alto posible. [3]

En *Polkabla v. Commission for the Blind*, 583 N.Y.S.2d 464 (App. Div. 1992), la división apelativa del Tribunal Supremo de Nueva York, revocó una determinación administrativa de no proveer ciertos servicios utilizando la misma interpretación ·literal del concepto *"maximizar"* aplicada en *Buchanan v. Ives, supra*.

Posteriormente, el tribunal de última instancia de New York, en *Romano v. VESID, supra*, en *Murphy v. VESID, supra* y en *Campbell v. VESID, supra*, reinterpretó las disposiciones del estatuto federal para establecer el criterio legal que se debe aplicar para determinar la responsabilidad estatal de proveer servicios bajo la Ley de Rehabilitación de 1973, *supra*.

En *Murphy v. VESID, supra*, luego de· haber sufragado los· gastos de educación de bachillerato à una persona con impedimentos cuya meta vocacional establecida en el PIRE era obtener un empleo relacionado con servicios legales, la agencia encargada de implantar la Ley de Rehabilitación de Nueva York, a saber, VESID; rechazó su solicitud de ayuda para cursar estudios en derecho. Al confirmar esta determinación, el tribunal señaló los parámetros bajo los cuales, a tenor de la Ley de Rehabilitación de 1973, *supra*, se definen los derechos y obligaciones· de las ·partes. Reconociendo que la Ley de ·Rehabilitación de 1973, *supra,* contempla el ofrecimiento de servicios vocacionales que ayuden a un individuo a alcanzar· *"his or her 'highest level of achievement'"*, en *Murphy v. VESID, supra,* a la pág. 963, el tribunal aclaró que esta obligación de maximizar ciertamente no es ilimitada.

*"Here, VESID and petitioner crafted an IWRP for the· purpose of making· petitioner employable in the field of legal services on a footing equal with nondisabled persons in the same field. Nothing in the record suggests· this has not occurred. Indeed, petitioner is now in, a position to reach her highest level of achievement, law school. And, like her·nondisabled counterparts who may harbor the same ambition, she will have to seek various avenues of financing to achieve that goal, such as student loans, grants, scholarships and/or work-produced ·savings.*

*VESID is not and should not be compelled to fund that effort inasmuch as its funds are finite.*"

Debemos destacar que la citada Sec. 701(b)(1) de la Ley de Rehabilitación de 1973, *supra*, limita el criterio expansivo utilizado en *Buchanan v. Ives, supra,* al expresar que el propósito es para "*empower individuals with disabilities to maximize employment*". Lo que requiere la ley es que la agencia capacite y le brinde las herramientas necesarias al individuo para que, por sí mismo, pueda alcanzar su nivel más alto de potencial profesional, luego de ser colocado en el mismo nivel que el resto de las personas con aspiraciones similares. *Murphy, v. VESID, supra.* De tal forma, el Gobierno cumple con su obligación de igualar a las personas con impedimentos para lograr su autosuficiencia económica, independencia y su integración en la comunidad. 29 U.S. C.A. sec. 701(b)(1).

En *Berg v. Florida Department of Labor*, 163 F.3d 1251 (11 Cir., 1998), el Undécimo Circuito Federal rechazó una reclamación de una persona con impedimentos bajo la Ley de Rehabilitación de 1973, *supra*, que cuestionaba la denegatoria del estado de sufragarle sus estudios de derecho. Con relación a la obligación del gobierno de "*maximizar*", según establecida en la Ley de Rehabilitación de 1973, *supra*, el tribunal federal rechazó el argumento de que la ley obliga a los estados a "*maximizar las habilidades*" del beneficiario. En cambio, dispuso que la ley requiere la maximización de empleo ("*maximize employment*"), pero sólo en aquel grado necesario para que la persona pueda obtener un empleo significativo, no necesariamente el mejor empleo posible. En fin, el tribunal apelativo recalcó, además, que el objetivo principal de estas leyes es eliminar aquellas barreras que la sociedad le impone a las personas con impedimentos, colocándoles en una posición similar al resto de las personas ("*equal footing*"), y no brindarles ventajas indebidas. *Id.*, a la pág. 1256.

Del mismo modo, en *Truss v. Tenn. Dept. of Human Services, supra,* el Tribunal de Apelaciones de Tennessee, al rechazar explícitamente el enfoque de *Buchanan v. Ives, supra*, enfatizó que tal perspectiva:

"*...would not only be financially infeasible, but would also hinder the ability of participating states to provide services to large numbers of disabled individuals. Rather, we think that, in using this language, Congress intended to require participating states to offer services to disabled individuals designed to render such individuals capable of attaining meaningful and gainful employment. Once such employment is attained, the disabled individual is then empowered with the opportunity to obtain his or her maximum employment as required by the Act.*"

En la Sec. 361.42 del Título 34 del *Code of Federal Regulations*, se dispone con relación a la Sec. 722 de la Ley de Rehabilitación de 1973, *supra*, que:

"*La determinación de elegibilidad para servicios estará basada en los siguientes requisitos:*

*i. Una determinación hecha por el personal cualificado de que el solicitante tiene un impedimento físico o mental.*

*ii. Una determinación hecha por personal cualificado de que el impedimento físico o mental del solicitante constituye o resulta en un impedimento sustancial para empleo.*

*iii. Una determinación hecha por un consejero en rehabilitación vocacional cualificado, empleado por una unidad estatal designada, de que el solicitante requiere servicios de rehabilitación vocacional para asegurar, retener o reobtener un empleo consistente con las fortalezas, recursos, prioridades, intereses, habilidades, capacidades y la selección informada del consumidor.*

*iv. Que el consumidor pueda beneficiarse, en términos de empleo, de los servicios de rehabilitación vocacional.*" [Traducción nuestra].

Por ultimo, el propósito primordial de la revisión judicial en el ámbito administrativo consiste en demarcar el ámbito de discreción de las agencias administrativas y cerciorarse que éstas ejecuten sus funciones de acuerdo con la ley. *P.C.M.E. v. J.C.A.*, res en. 23 de diciembre de 2005, 166 D.P.R. ___ (2005), **2006 J.T.S. 7**; *L.P.C. & D., Inc. v. A.C.*, 149 D.P.R. 869 (1999); *Mun. de San Juan v. J.C.A.*, 149 D.P.R. 263, 279 (1999); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64 (1998).

. Como es sabido, en el crisol judicial, las decisiones o resoluciones, al igual que las interpretaciones de las agencias administrativas, merecen gran consideración y respeto. *Hernández v. Centro Unido*, res en. 23 de diciembre de 2006, 168 D.P.R. ___ (2006), **2006 J.T.S. 140**; *P.C.M.E. v. J.C.A.*, supra; *Otero v. Toyota*, res. 3 de febrero de 2005, 163 D.P.R. ___ (2005), **2005 J.T.S. 13**; *Rivera Concepción v. A.R.P.E.*, 152 D.P.R. 116 (2000); *Castillo v. Depto. del Trabajo*, 152 D.P.R. 91 (2000); *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70 (2000). Esta deferencia judicial a las decisiones administrativas se debe a que son las agencias las que cuentan con el conocimiento experto y con la experiencia especializada de los asuntos que les son encomendados. *Municipio de San Juan v. Plaza Las América*, res. en 18 de octubre de 2006, 169 D.P.R. ___ (2006), **2006 J.T.S. 164**; *López v. Administración*, res. en 30 de agosto de 2006, 168 D.P.R. ___ (2006), **2006 J.T.S. 146**.

## IV

Dentro del marco jurídico antes enunciado, procedamos a resolver la controversia de autos.

Comencemos apuntando que tanto la ARV como la OPPI comparten el deber de interpretar y poner en vigor la Ley de Rehabilitación de 1973, *supra*. Por esta razón, la interpretación del estatuto que realice cualquiera de las dos agencias merece deferencia por parte de los tribunales.

En su escrito, el Procurador General nos señala que en la Meta de Empleo del PIRE de Torres fechado el 30 de junio de 2005, se hizo constar que: *"(s)e enmienda PIRE con el propósito de recomendar el auspicio de servicios de adiestramiento en el Área de Medicina General en la Universidad de Guadalajara, Mejico"*. Dicha recomendación fue realizada por la Sra. Paneto, Consejera de Torres, a la Oficina de Servicios de Consejería en Rehabilitación Vocacional (OSCRV), señalándole que el Equipo de Supervisión Técnica de Rehabilitación (ESTER) de la Región Sur había avalado el auspicio de los estudios de medicina. No obstante, el 21 de julio de 2005 se le indicó a Torres que no cualificaba para estudiar Medicina por haber cambiado su Meta Vocacional y haber terminado su Meta de Empleo en Tecnología Radiológica. A su vez, nos argumenta el Procurador General que Torres no cumple con los requisitos para el auspicio en Medicina General.

Por su parte, Torres, en su comparecencia ante nos, apunta que la prueba testifical y documental aceptada en evidencia por la OPPI señala que las enmiendas al PIE o PIRE se realizaron luego de evaluaciones abarcadoras. Plantea que dichos PIRES, a saber, del 3 de agosto de 2001, 10 de agosto de 2004 y 30 de junio de 2005, establecieron de forma expresa cómo se desarrollaron las enmiendas en su Meta de Empleo, la cual evolucionó de Técnica en Radiología a Medicina General. Entiende que la determinación de la ARV es una arbitraria y caprichosa la cual no se fundamentó en el expediente.

Comencemos apuntando que la Guía para el Servicio de Adiestramiento, citada por el Procurador General, dispone, en lo pertinente que:

"...

*3. El adiestramiento estará dirigido hacia una meta de empleo específica a lograrse por medio de un adiestramiento técnico, grado asociado o bachillerato, según sea el caso acordado entre el consumidor y su consejero, producto de una selección informada.*

*4. La ARV no auspiciará estudios a nivel de bachillerato o grado asociado como mejoramiento profesional,*

*como la justificación del servicio.*

*..."*.

A su vez, dicha Guía dispone que la ARV no está obligada a auspiciar adiestramientos a nivel universitario a los consumidores.

Para una persona con impedimentos que ya es Tecnóloga Radiológica, abandonar su empleo para estudiar una nueva carrera en Medicina resulta a todas luces un mejoramiento profesional. Es nuestra opinión que eso está expresamente excluido en las Guías para Proveer el Servicio de Adiestramiento Fuera de Puerto Rico de la ARV. Dicho reglamento interno no permite el auspicio de estudios fuera de Puerto Rico para mejoramiento profesional ni tampoco lo auspicia si la oferta educativa está disponible en instituciones locales y no constituye un requisito para lograr la meta de empleo.

Por otro lado, somos de opinión que en el caso de autos, la ARV cumplió con los estatutos federales y estatales maximizando la Meta de Empleo de Torres. El objetivo perseguido por la Ley de Rehabilitación de 1973, *supra*, es eliminar las barreras que la sociedad le impone a personas con impedimento. Esto se logra colocándolas en una posición similar al resto de las personas.

Lo que la ley requiere es que la agencia capacite y le brinde las herramientas necesarias al individuo para que por sí mismo pueda alcanzar su nivel más alto de potencial profesional, luego de colocarlo en el mismo nivel que el resto de las personas con aspiraciones similares.

Es nuestro criterio que bajo el crisol doctrinario, la obligación de la ARV de maximizar consistía en brindarle a Torres la oportunidad y ponerla en oposición de obtener un empleo al igual que las personas sin impedimentos en el campo de la Tecnología Radiológica. La ARV le sufragó a Torres los gastos necesarios para que obtuviese dicho título. Por lo tanto, la ARV capacitó a Torres para que pudiese obtener un empleo provechoso dentro del campo de la Tecnología Radiológica en igual de condiciones que una persona no impedida al tenor de la Ley de Rehabilitación de 1973, *supra*. Observamos que surge del expediente que Torres ejerció dentro del campo de la Tecnología Radiológica desde junio de 2001 hasta septiembre de 2003.

En conclusión, es forzoso concluir que la ARV respondió a los principios de la Ley de Rehabilitación de 1973, *supra*, pues cumplió con su obligación de maximizar la capacidad de empleo de Torres a los fines de capacitarse y estar en posición de conseguir empleo en el campo de la Tecnología Radiológica.

### V

Por los fundamentos que anteceden, se revoca la Resolución recurrida.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2008 DTA 91

**1.** El texto de dicho estatuto dispone que los servicios tienen que ser: *"necessary to assist an individual with disabilities in preparing for, securing, retaining, or regaining an employment outcome that is consistent with the strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice of the individual"* 29 U.S.C.A. sec. 723(a).

**2.** *Buchanan v. Ives*, 793 F. Supp. 361 (D. Maine 1991); *Indiana Dept. of Human Services v. Firth*, 590 N.E. 2d 154 (C.A. Indiana, 1992); *Zingher v. Dept. of Aging and Disabilities*, 664 A.2d 256 (Vt. 1995); *Truss v. Tennessee Dept. of Human*

*Services*, 1999 WL1072583 (Tenn. Ct. App); *Dolon v. Family and Social Services Admn.*, 715 N.E.2d 917 (Indiana, 1999); *Murdy v. Bureau of Blindness & Visual Services*, 677 A.2d 1280 (Penn. 1996); *Romano v. VESID*, 636 N.Y.S.2d 179 (N.Y., 1996); *Murphy v. VESID*, 243 N.Y.S.2d 365 (N.Y., 1997); *Campbell v. VESID*, 682 N.Y.S.2d 694 (N.Y., 1998); *Crowley v. Ohio Rehabilitation Services*, 711 N.E.2d 695 (Ohio, 1998); *Stevenson v. Commonwealth of Pennsylvania*, 648 A.2d 344 (Pa., 1994).

**3.** En *Buchanan v. Ives, supra,* el tribunal interpretó la Ley de Rehabilitación de 1973, según enmendada por la Ley 99-506 de 1986, la cual incluyó por primera vez la palabra *"maximizar."* Dicha ley en su Sec. 101 añadió como propósito del estatuto desarrollar programas *"for individuals with handicaps in order to maximize their employability, independence, and integration into the workplace and the community"*. Pub. L. No. 99-506, sec. 101, 1986 (100 Stat. 1807). Es menester destacar que dicho lenguaje fue enmendado en 1992 para leer como sigue: *"to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society"*. 1992 PL 102-569. October 29, 1992. 106 Stat. 4344.